42 A.3d 549

**Alonzo Jay KING, Jr.**

v.

**STATE of Maryland.**

**No. 68, Sept. Term, 2011.**

Court of Appeals of Maryland.

April 24, 2012.

Reconsideration Denied May 18, 2012.

552

Celia Anderson Davis, Assistant Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for Appellant.

Robert Taylor, Jr., Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for Appellee.

Sandra K. Levick, Tara Mikkilineni, David A. Taylor, Public Defender Service for the District of Columbia, Washington, DC, David Rocah, ACLU of Maryland Foundation, Baltimore, MD, for Amici Curiae brief of the Public Defender Service for District of Columbia and American Civil Liberties Union of Maryland in Support of Appellant, Alonzo J. King, Jr., urging reversal.

Argued before BELL, C.J., HARRELL, GREENE, ADKINS, BARBERA, ALAN M. WILNER, (Retired, Specially Assigned), and DALE R. CATHELL, (Retired, Specially Assigned), JJ.

HARRELL, J.

We consider here facial and as-applied constitutional challenges to that portion of the Maryland DNA Collection Act (the "Act") that purports to authorize State and local law enforcement authorities to collect DNA [1] samples from individuals who are arrested for a crime of violence,[2] an attempted crime of violence, a burglary, or an attempted burglary. Maryland Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–504(3). Appellant, Alonzo Jay King, Jr., was arrested in 2009 on first- and second-degree assault charges. Pursuant to § 2–504(3) of the Act, King's DNA was collected, analyzed, and entered into Maryland's DNA database. King was convicted ultimately on the second-degree assault charge but, pending his trial on that charge, his DNA profile generated a match to a DNA sample collected from a sexual assault forensic examination conducted on the victim of an unsolved 2003 rape. This "hit" provided the sole probable cause for a subsequent grand jury indictment of King for the rape. A later-obtained search warrant ordered collection from King of an additional reference DNA sample, which, after processing and analysis, matched also the DNA profile from the 2003 rape. King was convicted of first-degree rape and sentenced to life in prison.

Although previously we upheld the constitutionality of the Act, as applied to convicted felons, in *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004), the present case presents an extension of the statute, not present in *Raines*. Thus, we evaluate here rights given to, and withdrawn from, citizens who have been arrested, including the right to be free from unreasonable

---

1. DNA means deoxyribonucleic acid. Maryland Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–501(g). DNA is the carrier of genetic information that comprises chromosomes and is individual to each person, aside from identical twins. For a comprehensive review of the science behind DNA, see *Armstead v. State*, 342 Md. 38, 673 A.2d 221 (1996).

2. "Crime of violence" means any enumerated crime in § 14–101 of the Criminal Law Article, including first-degree assault. Meaningfully for the present case, second-degree assault is not an enumerated crime of violence. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–501(e).

searches and seizures. Under the totality of the circumstances balancing test, see *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001), we conclude, on the facts of this case, that King, who was arrested, but not convicted, at the time of his first compelled DNA collection, generally has a sufficiently weighty and reasonable expectation of privacy against warrantless, suspicionless searches that is not outweighed by the State's purported interest in assuring proper identification of him as to the crimes for which he was charged at the time. The State (through local law enforcement), prior to obtaining a DNA sample from King following his arrest on the assault charges, identified King accurately and confidently through photographs and fingerprints. It had no legitimate need for a DNA sample in order to be confident who it arrested or to convict him on the first-or second-degree assault charges. Therefore, there was no probable cause or individualized suspicion supporting obtention of the DNA sample collection for those charges. We conclude that the portions of the DNA Act authorizing collection of a DNA sample from a mere arrestee is unconstitutional as applied to King. Although we have some trepidation as to the facial constitutionality of the DNA Act, as to arrestees generally, we cannot exclude the possibility that there may be, in some circumstances, a need for the State to obtain a DNA sample to identify an arrestee accurately.

## I. Factual and Procedural Background

The tale of this case began on 10 April 2009, when appellant was arrested in Wicomico County, Maryland, on first- and second-degree assault charges unrelated to the rape charge underlying the prosecution of the present case.[3] Prior to the disposition of the assault charges, because King was charged with a crime of violence, the Act authorized collection of a

---

3. King entered an *Alford* plea and was found guilty in the Circuit Court for Wicomico County on 16 September 2009 of one misdemeanor count of second-degree assault stemming from his 10 April 2009 arrest. The first-degree assault charges were entered *nolle prosequi*. He was sentenced to four-years' imprisonment, with all but one year suspended.

DNA sample. Personnel at the Wicomico County Central Booking facility used a buccal swab to collect a DNA sample [4] from King on the day of his arrest.[5] The sample was received and processed by the Maryland State Police Forensic Sciences Division and later analyzed by a private vendor laboratory. On 13 July 2009, the DNA record [6] was uploaded to the Maryland DNA database. Detective Barry Tucker of the Salisbury Police Department received notice from the State Police, on 4 August 2009, that there had been a "hit" on King's DNA profile in an unsolved rape case.

The DNA database "hit" identified King's DNA profile as a match to a profile developed from a DNA sample collected in a 2003 unsolved rape case in Salisbury, Maryland. In that case, on 21 September 2003, an unidentified man broke into the home of Vonette W., a 53–year–old woman. The man, wearing a scarf over his face, a hat pulled over his head, and armed with a hand gun, entered Vonette W.'s bedroom, and ordered

---

**4.** DNA sample, under the Act, means:

a body fluid or tissue sample that is: (1) provided by an individual who is convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article; (2) provided by an individual who is charged with: (i) a crime of violence or an attempt to commit a crime of violence; or (ii) burglary or an attempt to commit burglary; or (3) submitted to the statewide DNA data base system for testing as part of a criminal investigation.

Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–501(i).

**5.** A buccal swab DNA collection requires the collector to swab up-and-down and rotate a sterile cotton swab on the interior of the cheek in the subject's mouth, with enough pressure to remove cells. This process is repeated on the other cheek with a separate cotton swab. Forensic Sci. Div., Md. State Police, *Guidelines for Submitting Physical Evidence* (2010), available at http://icac.mdsp.org/downloads/FSDSubmission Guide.pdf.

**6.** DNA record, under the Act, means "DNA information stored in CODIS or the statewide DNA data base system" and "includes the information commonly referred to as a DNA profile." Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–501(h). CODIS means "the Federal Bureau of Investigation's "Combined DNA Index System" that allows the storage and exchange of DNA records submitted by federal, state, and local forensic DNA laboratories." Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–501(c).

her not to look at him. While holding the gun to her head, he raped Vonette W. After the rape, he left with Vonette W.'s purse. Vonette W. called immediately her daughter for help. Salisbury Police officers arranged for the victim to be transported to Peninsula Regional Medical Center, where she underwent a sexual assault forensic examination. Semen was collected from a vaginal swab. The swab was processed and the DNA profile uploaded to the Maryland DNA database. No matches resulted at that time. Vonette W. was unable to identify the man who attacked her other than to say that he was African–American, between 20 and 25 years old, five-foot-six inches tall, and with a light-to-medium physique. Police searched the area around the victim's home and conducted interviews, but were unable to identify the attacker.

Detective Tucker presented the 4 August 2009 DNA database "hit" to a Wicomico County grand jury which, on 13 October 2009, returned an indictment against King for ten charges arising from the crimes committed against Vonette W., including first-degree rape.[7] The DNA database "hit" was the only evidence of probable cause supporting the indictment. On 18 November 2009, Detective Tucker obtained a search warrant and collected a second buccal swab from King. The second buccal swab matched also the sample collected from Vonette W. during the 2003 sexual assault forensic examination.

King filed in the Circuit Court for Wicomico County an omnibus motion that included a request to suppress evidence obtained through an illegal search and seizure.[8] On 12 Febru-

---

7. The complete list of charges included: first-degree burglary, third-degree burglary, first-degree rape, attempted first-degree rape, second-degree rape, attempted second-degree rape, armed robbery, robbery, handgun use in a violent crime, and carrying a handgun.

8. This Court has criticized omnibus boilerplate motions filed routinely on behalf of defendants in criminal cases as containing unsupported "bald allegations." *See Jones v. State*, 395 Md. 97, 103 n. 3, 909 A.2d 650, 655 n. 3 (2006); *Denicolis v. State*, 378 Md. 646, 660–61, 837 A.2d 944, 953–54 (2003). King's omnibus defense motion requested vaguely suppression of "[e]vidence seized in this case . . . as a result of an illegal

ary 2010, the Circuit Court held a hearing on the motion. The thrust of King's argument was that the DNA Act could not survive scrutiny under the Fourth Amendment and therefore King's arrest was invalid.[9] He argued also that the State did not collect King's first DNA sample in accordance with the procedures specified by the DNA Act and, therefore, that the indictment for the charges arising from the 2003 rape was invalid. The hearing judge solicited memoranda of law on the illegal search-and-seizure issue raised at the hearing.[10]

On 26 February 2009, the hearing judge issued a memorandum opinion denying King's motion to suppress. The memorandum opinion upheld the constitutionality of the Maryland DNA Collection Act's authorization to collect DNA from arrestees, citing to this Court's holding in *State v. Raines*, 383 Md. 1, 857 A.2d 19 (2004), and concluded that the arrest of King on the 2009 assault charges and seizure of his DNA were presumed lawful; therefore, the defense bore the burden to prove that the warrant for the second DNA sample was invalid. The judge noted the analysis in *Fitzgerald v. State*, 153 Md.App. 601, 638, 837 A.2d 989, 1010 (2003) (citing *Franks v. Delaware*, 438 U.S. 154, 160, 98 S.Ct. 2674, 2678, 57 L.Ed.2d 667, 675 (1978)), *aff'd* 384 Md. 484, 864 A.2d 1006 (2004), which lead to a conclusion that when a defendant challenges a warrant outside of its "four corners," the burden shifts to the defendant to demonstrate, by a preponderance of the evidence, that the State's supporting factual allegations to obtain the warrant are tainted by "deliberate falsehood or with reckless disregard for the truth." Because King did not allege or present evidence of falsehood or reckless disregard for the truth, the

---

search and seizure." At both motions hearings, however, King articulated a Fourth Amendment violation as the critical illegal search and seizure and requested suppression specifically of his DNA sample. Therefore, the issue before us was preserved properly.

**9.** King argued alternatively, but without much force, that DNA was not collected actually from him on 10 April 2009, after his arrest.

**10.** King submitted a memorandum; the State did not.

hearing judge concluded King had not met his burden under *Franks*.

On 26 March 2010, the same judge presided over a second hearing on King's motion to suppress in order to allow King to present evidence that the warrant was based on falsehood or reckless disregard for the truth. King called Michelle Groves, custodian of the Maryland State Police Forensics Division Crime Lab, as a witness. In an attempt to show that the State could not prove that all predicate requirements for collection of a DNA sample under the Maryland DNA Collection Act (i.e., collection must be completed by an approved person[11]) were observed and therefore the warrant based on that sample was invalid, King questioned Groves about the handling and custody of the first DNA sample. Groves could not provide any records of the training or qualifications of the person who collected King's first DNA sample and could not provide affirmative evidence that King was given a required notice about the Act's expungement provisions.[12] The State countered that King had not adduced any evidence of error or irregularity in the DNA collection procedures. The hearing judge concluded that King failed to meet his burden under *Franks* and denied again the motion to suppress.

Ultimately, King plead not guilty to the charges arising from the 2003 rape of Vonette W., on an agreed statement of facts, in order to preserve his right to appeal the constitutional issues he raised. King was convicted and sentenced to life in prison, without the possibility of parole. On 12 October 2010, King filed timely a notice of appeal to the Court of Special Appeals, but we issued a writ of certiorari on our initiative, *King v. State*, 422 Md. 353, 30 A.3d 193 (2011), before the intermediate appellate court could decide the appeal. Appellant poses two questions for our consideration:

---

11. Collection procedures, under the Act, are described in Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–504(b), (c).

12. Expungement provisions, under the Act, are described in Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–511.

1. Did the trial court err by denying Appellant's motion to suppress DNA evidence obtained through a warrantless search conducted without any individualized suspicion of wrongdoing?

2. Did the court below improperly shift the burden of proof to the defense to demonstrate that a search or seizure made without individualized suspicion is unreasonable?

We hold that § 2–504(3) of the Maryland DNA Collection Act, which allows DNA collection from persons arrested, but not yet convicted, for crimes of violence and burglary, is unconstitutional, under the Fourth Amendment totality of the circumstances balancing test, as applied to the relevant facts of this case because King's expectation of privacy is greater than the State's purported interest in using King's DNA to identify him for purposes of his 10 April 2009 arrest on the assault charges. Concluding that, in King's circumstances, his DNA was collected unconstitutionally, and the evidence presented at trial should have been suppressed as "fruit of the poisonous tree," we do not reach King's second question as it becomes moot. Accordingly, we reverse the judgment of the Circuit Court for Wicomico County and remand the case to that court for a new trial, consistent with the views expressed in this opinion.

## II. Standard of Review

Reviewing a trial court's disposition of a motion to suppress evidence, we view the evidence presented at the hearing, along with any reasonable inferences drawable therefrom, in a light most favorable to the prevailing party, which, in the present situation, was the State. *Bailey v. State*, 412 Md. 349, 363, 987 A.2d 72, 80 (2010) (citing *Crosby v. State*, 408 Md. 490, 504, 970 A.2d 894, 902 (2009); *Longshore v. State*, 399 Md. 486, 498, 924 A.2d 1129, 1135 (2007)). The reviewing court defers to the fact-finding of the hearing court, unless the findings are erroneous clearly. *Id.* We apply, however, a non-deferential standard of review when making the ultimate legal determination as to whether the evidence was seized properly under the Fourth Amendment. *Williamson v. State*, 413 Md.

521, 532, 993 A.2d 626, 632 (2010) (citing *Bailey,* 412 Md. at 362, 987 A.2d at 80; *Crosby,* 408 Md. at 504–05, 970 A.2d at 902).

## III. Discussion

Appellant argues that the Fourth Amendment protects mere arrestees, who are cloaked with the assumption of innocence until proven guilty, from unreasonable, warrantless, and suspicionless seizures and searches of their genetic material made pursuant to the Maryland DNA Collection Act. King maintains that the Maryland DNA Collection Act is unconstitutional facially under the Fourth Amendment, and also that the statute is invalid as applied to the facts of his case. The State counters that there is an overriding governmental interest in identifying arrestees accurately, that DNA profiles developed from arrestees under the Maryland DNA Collection Act are used only for identification purposes (under an expansive view of what constitutes "identification"), and that arrestees have no expectation of privacy in their identity.

### A. The Fourth Amendment

The Fourth Amendment to the United States Constitution provides,

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is applicable to Maryland through the Fourteenth Amendment. *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59, 61 (1991). We evaluate Fourth Amendment challenges under the reasonableness test articulated by Justice Harlan in his concurring opinion in *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587–88 (1967), a standard adopted by this Court in *Venner v. State,* 279 Md. 47, 51–52, 367 A.2d 949,

952 (1977). The *Katz* reasonableness test requires first that the person have an "actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 587–88 (Harlan, J., concurring). A seizure or search will be upheld even if there is a reasonable expectation of privacy when the government has a "special need." *See Griffin v. Wisconsin,* 483 U.S. 868, 875, 107 S.Ct. 3164, 3169, 97 L.Ed.2d 709, 718 (1987) (upholding a warrantless search of a probationer because the government had a "special need" for the "exercise of supervision to assure that restrictions are in fact observed"); *Skinner v. Ry. Labor Execs. Ass'n,* 489 U.S. 602, 633, 109 S.Ct. 1402, 1422, 103 L.Ed.2d 639, 670 (1989) (upholding warrantless and suspicionless alcohol and drug test for railway employees). The State does little more than mention the special needs exception in the present case, for good reason, because its narrow confines do not embrace the case at bar.

■ The context for evaluating the Fourth Amendment challenges where a reasonable expectation of privacy competes with government interests was set forth by the Supreme Court in *United States v. Knights,* 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). In *Knights,* the Supreme Court upheld a warrantless search of a probationer's apartment, using the "totality of the circumstances" approach set forth in *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347, 354 (1996). *Knights,* 534 U.S. at 118, 122 S.Ct. at 591, 151 L.Ed.2d at 505. Reasonableness in a Fourth Amendment analysis is determined

> by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests.

*Knights,* 534 U.S. at 118–19, 122 S.Ct. at 591, 151 L.Ed.2d at 505 (quoting *Wyoming v. Houghton,* 526 U.S. 295, 300, 119 S.Ct. 1297, 1300, 143 L.Ed.2d 408, 414 (1999)). The Court considered as weighty Knights's status as a probationer, which "like incarceration, is a form of criminal sanction imposed by a

court upon an offender after verdict, finding, or plea of guilty." *Knights,* 534 U.S. at 119, 122 S.Ct. at 591, 151 L.Ed.2d at 505 (citing *Griffin,* 483 U.S. at 874, 107 S.Ct. at 3168, 97 L.Ed.2d at 717) (internal quotation omitted). Probation, noted the Court, was one point on a continuum of punishments for convicted criminals whose freedoms may be curtailed beyond those of law-abiding citizens. *Id.* Further, Knights's probation order stated clearly that warrantless searches were a condition of his probation; therefore, the Court concluded his expectation of privacy was diminished. *Knights,* 534 U.S. at 119–20, 122 S.Ct. at 591–92, 151 L.Ed.2d at 505.

On the other side of the "totality of the circumstances" scale from the individual's privacy interest is the government interest in conducting the search. In Knights's situation, the government had a legitimate interest in his rehabilitation and protecting society from future criminal actions. *Knights,* 534 U.S. at 119, 122 S.Ct. at 591–92, 151 L.Ed.2d at 505. The high recidivism rate of probationers fueled a strong government interest that weighed heavily against Knights's diminished expectation of privacy. *Knights,* 534 U.S. at 120, 122 S.Ct. at 592, 151 L.Ed.2d at 506 (noting a Justice Department report that found 43% of probationers were re-arrested for a felony within three years of release). The Court concluded that the government had a legitimate interest in preventing future crimes committed by probationers by conducting warrantless searches of probationers' residences. *Knights,* 534 U.S. at 121, 122 S.Ct. at 592, 151 L.Ed.2d at 506. Balancing Knights's reduced expectation of privacy as a probationer against the government's interests in preventing recidivism and protecting the public, the Court observed that less than "probable cause" (in the form of reasonable suspicion, rather than individualized suspicion) was required for a search of Knights's residence. *Id.*

The Supreme Court deployed later the *Knights* "totality of the circumstances" test to determine whether a suspicionless search of a parolee, conducted by a police officer on a public sidewalk, was reasonable under the Fourth Amendment. *Samson v. California,* 547 U.S. 843, 126 S.Ct. 2193, 165

L.Ed.2d 250 (2006). The Court concluded that, on the continuum of punishments imposed for criminal violations, a parolee has "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation...." *Samson*, 547 U.S. at 850, 126 S.Ct. at 2198, 165 L.Ed.2d at 258. Parolees are subject to a wide range of conditions for their release, including mandatory drug tests, restrictions on personal associations and activities, psychiatric treatment, residence approval, and mandatory meetings with parole agents. *Samson*, 547 U.S. at 851, 126 S.Ct. at 2199, 165 L.Ed.2d at 259. As in *Knights*, *Samson* focused heavily on the high recidivism rate of the parolee population, which, in California during the relevant time, approached 70 percent. *Samson*, 547 U.S. at 853, 126 S.Ct. at 2199, 165 L.Ed.2d at 259. The Court concluded that the government interest in re-integrating parolees, protecting society from future criminal actions, along with a statutory prohibition against "arbitrary, capricious, or harassing" searches, outweighed the parolee's diminished expectation of privacy under the "totality of the circumstances." *Samson*, 547 U.S. at 856, 126 S.Ct. at 2202, 165 L.Ed.2d at 262.

## B. The Maryland DNA Collection Act

The Maryland DNA Collection Act was enacted in 1994. The portions of the current statute challenged by Appellant were added in 2008.[13] 2008 Md. Laws 337. The stated purpose of the statute is to "analyze and type the genetic markers contained in or derived from the DNA samples;" to assist an official investigation of a crime; to identify human remains; to identify missing persons; and for "research and administrative purposes," including the development of a pop-

---

13. The amendments to the Maryland DNA Collection Act directed to arrestees are subject to sunset provisions. Absent affirmative action from the Legislature to re-enact them, §§ 2–501, 2–504, 2–505, 2–506, 2–511, 2–512, 2–513, and 2–514 will be abrogated on 31 December 2013 and replaced with sections that do not permit DNA collection from arrestees. The current provisions for collection of DNA from convicted felons, however, will remain.

ulation database [14] and to aid in quality assurance. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–505. The 2008 amendments affected primarily § 2–501(i), Definitions [15] and § 2–504, Collection of DNA Samples.[16] 2008 Md. Laws 337.

---

14. Population database means "a collection of DNA profiles, usually grouped by race, used for statistical evaluation, research, quality control, and protocol development of forensic DNA analysis methods." No personal identifying information is used in the population database. Md.Code Regs. 29.05.01.01(B)(25) (2011).

15. § 2–501. Definitions.

(i) DNA sample.—"DNA sample" means a body fluid or tissue sample that is: (1) provided by an individual who is convicted of a felony or a violation of § 6–205 or § 6–206 of the Criminal Law Article; *(2) provided by an individual who is charged with: (i) a crime of violence or an attempt to commit a crime of violence; or (ii) burglary or an attempt to commit burglary; or* (3) submitted to the statewide DNA data base system for testing as part of a criminal investigation. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–501(i) (emphasis added to 2008 amended text).

16. The text added to § 2–504 that is relevant to the present case was: (3) (i) In accordance with regulations adopted under this subtitle, a DNA sample shall be collected from an individual who is charged with: 1. a crime of violence or an attempt to commit a crime of violence; or 2. burglary or an attempt to commit burglary. (ii) At the time of collection of the DNA sample under this paragraph, the individual from whom a sample is collected shall be given notice that the DNA record may be expunged and the DNA sample destroyed in accordance with § 2–511 of this subtitle. (iii) DNA evidence collected from a crime scene or collected as evidence of sexual assault at a hospital that a law enforcement investigator considers *relevant to the* identification or exoneration of a suspect shall be tested as soon as reasonably possible following collection of the sample.

(d) Testing of sample from individual charged with crime under subsection (a)(3).—

(1) A DNA sample collected from an individual charged with a crime under subsection (a)(3) of this section may not be tested or placed in the statewide DNA data base system prior to the first scheduled arraignment date unless requested or consented to by the individual as provided in paragraph (3) of this subsection.

(2) If all qualifying criminal charges are determined to be unsupported by probable cause: (i) the DNA sample shall be immediately destroyed; and (ii) notice shall be sent to the defendant and counsel of record for the defendant that the sample was destroyed.

(3) An individual may request or consent to have the individual's DNA sample processed prior to arraignment for the sole purpose of having the sample checked against a sample that: (i) has been

The amendments purport to allow the State to collect DNA samples from individuals arrested for crimes (or attempted crimes) of violence or burglary prior to being found guilty or pleading guilty. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–504(a)(3). DNA samples are collected from arrestees when the individual is charged (or at a correctional facility if the arrestee is in custody) by an authorized collector trained in the collection protocols used by the Maryland State Police Crime Laboratory. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–504(c). Samples may be collected with reasonable force, if necessary, and are mailed to the Maryland State Police Crime Laboratory within 24 hours of collection. Md.Code Regs. 29.05.01.04(C) & (M) (2011). The samples are not tested or placed in the statewide DNA system until the first scheduled arraignment of the arrestee, or earlier if the arrestee gives consent. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–504(d).

DNA samples are analyzed in accordance with FBI standards and CODIS requirements. Md.Code Regs. 29.05.01.09(A) (2011). In the present case, King's DNA samples were sent to an approved vendor laboratory for analysis. While the specific type of scientific analysis to be employed is not prescribed by the statute, the polymerase chain reaction ("PCR") method is used commonly by laboratories to analyze DNA samples. Mary McCarthy, *Am I My Brother's Keeper?: Familial DNA Searches in the Twenty-first Century*, 86 Notre Dame L.Rev. 381, 384 (2011). In DNA analyses performed to comply with FBI/CODIS standards, PCR is used to replicate 13 core short-tandem-repeat loci. *Id.* These 13 loci were chosen by the FBI for CODIS, in response to congres-

---

processed from the crime scene or the hospital; and (ii) is related to the charges against the individual.

(e) Second DNA sample.—A second DNA sample shall be taken if needed to obtain sufficient DNA for the statewide DNA data base system or if ordered by the court for good cause shown.

(f) Failure to provide DNA sample.—Failure of an individual who is not sentenced to a term of imprisonment to provide a DNA sample within 90 days after notice by the Director is a violation of probation. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–504.

sional concern over privacy protections, because they are considered "non-coding" DNA that are thought not to reveal private information.[17] H. Rep. 106–900(I), at 27 (2000) (codified at 42 U.S.C. §§ 13701–14223 (2012)) (stating that the records do not "reveal information relating to any medical condition or other trait"). Once the DNA sample is analyzed, the DNA record (a numerical representation of the information at each loci) is uploaded to the statewide searchable DNA electronic database or the FBI CODIS database. No identifying information, criminal history, photographs, or fingerprints are stored supposedly alongside the DNA record in either DNA database. *CODIS and DNIS Fact Sheet,* Fed. Bureau of Investigation, http://www.fbi.gov/about-us/lab/codis/codis-and-ndis-fact-sheet (last visited 19 April 2012). When the DNA database produces a match (a "hit") between an arrestee's sample and one stored previously in a database, the Maryland State Police notify the law enforcement officer who provided the sample. The original sample "hit" may be used thereafter only as probable cause to obtain a warrant to obtain a second sample and is not admissible as evidence at trial. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–510.

If an arrestee is not convicted of the charge or charges which lead to his/her qualifying arrest(s), the DNA samples and records are required to be destroyed or expunged by the authorities. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–511(a). There is no expungement allowed, however, if the precipitating charge or charges against an arrestee are placed on the stet docket or the arrestee received probation before judgment. Md.Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–511(2). The Act provides also for penalties for misuse of DNA records, unauthorized testing of DNA samples, or wilful failure to destroy DNA samples. Md.Code (2003, 2011 Repl. Vol.), Pub. Safety Art., § 2–512.

---

17. There is, however, considerable current debate as to whether these "non-coding" or "junk" DNA provide no predictive genetic information. *See* Simon A. Cole, *Is the "Junk" DNA Designation Bunk?,* 102 Nw. U.L.Rev. 54, 54 (2007) (highlighting an academic debate on the significance of non-coding DNA).

In *Raines*, 383 Md. at 25, 857 A.2d at 33, a plurality of this Court upheld the constitutionality, against a Fourth Amendment challenge, of the then-extant DNA collection statutory scheme, which, prior to the 2008 amendments, provided for collection of DNA samples only from individuals convicted of felonies, fourth-degree burglary, or breaking and entering into a vehicle. The Court, however, was divided deeply in reaching that result. The plurality opinion was authored by Judge Cathell. Two members of the four judge majority authored separate concurring opinions.

Raines was convicted of two separate robberies committed in 1996. In 1999, while serving a sentence in prison for a crime unrelated to the robberies, his DNA was collected pursuant to the Act as it then existed, because the 1996 robberies were qualifying felonies. *Raines*, 383 Md. at 5 n. 5, 857 A.2d at 22 n. 5 (plurality opinion). In 2002, the DNA profile from a 1996 unsolved rape was uploaded to the state-wide database and found to match Raines's DNA profile collected in 1999. *Raines*, 383 Md. at 6, 857 A.2d at 22 (plurality opinion). Using the DNA database hit as probable cause, the State obtained a search warrant to obtain a saliva sample from Raines in February 2003. *Raines*, 383 Md. at 6–7, 857 A.2d at 22 (plurality opinion). As a result of the second DNA profile match and the testimony of the 1996 rape victim, a grand jury returned an indictment against Raines for first- and second-degree rape and robbery. *Raines*, 383 Md. at 7, 857 A.2d at 22 (plurality opinion). Prior to his trial on the rape charges, Raines moved to suppress the DNA evidence, asserting that the original search was unconstitutional. *Raines*, 383 Md. at 7, 857 A.2d at 23 (plurality opinion). The motions court agreed. *Id.* The plurality opinion, on appeal, reversed the suppression of the evidence, noting that nearly every federal and state court that had decided an analogous question upheld against Fourth Amendment attack the collection of DNA from convicted felons. *Raines*, 383 Md. at 12, 857 A.2d at 25 (plurality opinion). Using the balancing test for determining whether a search is reasonable under the Fourth Amendment, the plurality upheld the constitutionality

of the Maryland DNA Collection Act, as applied to convicted felons. *Raines*, 383 Md. at 18, 857 A.2d at 29.

On the privacy interest side of the scales of the balancing test, the Court considered Raines's status as a convicted and incarcerated person as one with "severely diminished expectation of privacy." *Raines*, 383 Md. at 25, 857 A.2d at 33 (plurality opinion). The plurality opinion diluted further Raines's expectation of privacy by crediting that the purpose of the DNA collection was to "identify" convicted felons; no incarcerated individual has an expectation of privacy in his or her identity. *Id.* The Court distinguished the interest in searching for "identification" from searching "ordinary individuals for the purpose of gathering evidence against them in order to prosecute them for the very crimes that the search reveals." *Id.* Using the *Knights* test, the Court concluded that there is

> no reason why a search cannot be reasonable absent an individualized suspicion in the limited circumstances of this case, where the individual's expectation of privacy was even more limited than in *Knights*, the government intrusion, a buccal swab, was minimal at most and the government objective is as strong as in *Knights*.

*Raines*, 383 Md. at 17, 857 A.2d at 29 (plurality opinion). A government interest highlighted in *Raines* was to identify recidivists, persons involved with crimes, and unidentified bodies. 383 Md. at 21, 857 A.2d at 31 (plurality opinion).

Judge Raker's concurring opinion disagreed with the plurality opinion as to its conclusion of the severely limited expectation of privacy a convicted felon has in his/her bodily fluids, but upheld the statute based on her acceptance of the analogy between fingerprints and DNA profiles as providing purely identifying information. *Raines*, 383 Md. at 44–45, 857 A.2d at 45 (nodding to the State's assertion that a DNA profile is just a series of numbers, similar to a social security number). In a separate concurring opinion, Judge Wilner criticized the plurality opinion's characterization of the State's interest in the DNA as simply identification, calling it "misleading even to

suggest, much less hold, that this program is not designed for the predominant purpose of providing evidence of criminality." *Raines*, 383 Md. at 51, 857 A.2d at 49. He conceded, however, that convicted criminals have a high rate of recidivism and that DNA's reliability serves the government's interest in identification in the same way as fingerprints and photographs do. *Raines*, 383 Md. at 51–52, 857 A.2d at 49 (Wilner, J., concurring).

In our next relevant case to consider the Fourth Amendment implications of the Act, *Williamson v. State*, 413 Md. 521, 526, 993 A.2d 626, 629 (2010), a woman told police in 1994 that Williamson had raped her. A sexual assault examination was performed and vaginal swab collected (but no DNA was analyzed). *Id.* Williamson entered ultimately an *Alford* plea to battery in the case. *Id.* In 2002, a different woman told police that an unknown assailant raped her, a sexual assault forensic examination was performed, and a vaginal swab was collected. *Williamson*, 413 Md. at 526, 993 A.2d at 629. The DNA was analyzed and uploaded to the database, but there were no DNA profile matches. *Williamson*, 413 Md. at 526–27, 993 A.2d at 629–30. In 2005, Anne Arundel County Police received a financial grant to be used to solve cold cases. *Williamson*, 413 Md. at 527, 993 A.2d at 630. Pursuant to the grant, the police analyzed the vaginal swab from the 1994 alleged rape, which resulted in a match to the DNA profile in the 2002 rape. *Id.* Police suspected Williamson of both rapes. *Id.* After being arrested on an unrelated open warrant and while he was held in a police interrogation room, Williamson was given a McDonald's meal [18] by the police. *Id.* He drank from the drink cup and left the debris behind when he was taken from the room. *Id.* The police recovered the discarded cup and swabbed it for DNA. *Id.* The DNA thus obtained was analyzed and the results uploaded to the database, yielding a match to the specimens obtained from the 1994 and 2002

---

18. The record does not specify whether Williamson was provided with a McDonald's Extra Value Meal. If that was what he received, it appears that the State received the "extra value," not Williamson.

rapes. *Williamson*, 413 Md. at 528, 993 A.2d at 630. Williamson was indicted by a grand jury for charges stemming from the 2002 rape. *Williamson*, 413 Md. at 528, 993 A.2d at 631.

Applying the two-part test from *Katz*, the Court concluded that Williamson abandoned the McDonald's cup in the police station and, therefore, could expect reasonably that the police might collect and investigate the cup. *Williamson*, 413 Md. at 536–37, 993 A.2d at 635. Williamson argued that, even if the cup was seized lawfully, the analysis of his DNA sample constituted a second and subsequent search and seizure for the purposes of the Fourth Amendment, which required a warrant. *Williamson*, 413 Md. at 539, 993 A.2d at 637. In dicta, the Court suggested that "[h]ad the police compelled Williamson to give a DNA sample as a pre-trial detainee, Williamson's argument may have had some weight." *Williamson*, 413 Md. at 540, 993 A.2d at 637. Relying on the declaration in *Raines* that DNA profiles produced under the authority of the Maryland DNA Collection Act provide identification of the person only, rather than being concerned with the vast amount of genetic information contained within the actual DNA sample, the Court concluded that, because Williamson abandoned the cup, there was no Fourth Amendment search implicated by the analysis of the DNA sample. *Williamson*, 413 Md. at 547, 993 A.2d at 641 (analogizing the abandoned DNA on the cup to a garbage bag left outside the curtilage of a home).

Most recently, in *Raynor v. State*, 201 Md.App. 209, 29 A.3d 617 (2011), our colleagues on the Court of Special Appeals tackled another facet of analyzing a reasonable expectation of privacy in one's DNA under Fourth Amendment jurisprudence. Appellant Raynor became a suspect in an unsolved rape case and was asked by State Police to come to the local barracks to talk about the investigation. *Raynor*, 201 Md.App. at 214–15, 29 A.3d at 620. The police asked Raynor for a DNA sample; he refused. *Raynor*, 201 Md.App. at 215, 29 A.3d at 621. During the interview, however, Raynor rubbed repeatedly his hands up and down the arm-rests of the chair in which he was seated. *Id.* After the interview, the police

swabbed the arm-rests and obtained a viable DNA sample that, once analyzed, matched the sample taken from a rape kit obtained from the victim. *Raynor,* 201 Md.App. at 215, 29 A.3d at 621. The trial court refused, on Raynor's motion, to suppress the DNA evidence. *Raynor,* 201 Md.App. at 216, 29 A.3d at 621–22. On appeal, the thrust of Raynor's argument (similar to *Williamson*'s, *supra* ) was that he had a reasonable expectation of privacy in the DNA within his skin cells, despite the latter having been gathered lawfully by the police from the arm-rests. *Raynor,* 201 Md.App. at 217, 29 A.3d at 622. The Court of Special Appeals, relying principally on the reasoning of Judge Raker's concurring opinion in *Raines,* concluded that "even if appellant could demonstrate a *subjective* expectation of privacy in his DNA profile, he nonetheless had no *objectively reasonable* expectation of privacy in it because it was used for identification purposes only." *Raynor,* 201 Md.App. at 222, 29 A.3d at 625. The intermediate appellate court reasoned that collection of the DNA from the chair was analogous to collection of a latent fingerprint and, therefore, was not a constitutionally-protected search. *Id.*

### C. The State of Fourth Amendment Challenges to Analogous Federal and other State Statutes

Courts have upheld overwhelmingly against Fourth Amendment challenges federal and state statutes authorizing warrantless, suspicionless DNA collection from convicted criminals, including incarcerated prisoners, parolees, and probationers. Federal and state courts are divided, however, on the constitutionality of requiring mere arrestees to submit to DNA sample collection. At the heart of this debate (and the present case) is the presumption of innocence cloaking arrestees and whether legitimate government interests outweigh the rights of a person who has not been adjudicated guilty of the charged crime, and is somewhere closer along the continuum to a person who is not charged with a crime than he or she is to someone convicted of a crime.

In *People v. Buza,* 129 Cal.Rptr.3d 753, 755 (Cal.Ct.App. 2011), *cert. granted,* —— Cal.4th ——, 132 Cal.Rptr.3d 616, 262

P.3d 854 (2011), the First Appellate District, Division Two, of the Court of Appeal of California held unconstitutional facially the section of California's Forensic Identification Database and Data Bank Act of 1998 ("California DNA Collection Act") (Cal.Penal Code § 296 (2011)), that authorized the taking of a DNA sample from all adults arrested or charged with a felony.[19] Mark Buza was arrested for arson and vandalism and asked to provide a DNA sample, as required by the California Act; he refused. *Id.* Buza was informed that, under the California Act, refusal to provide a DNA sample after arrest was itself a misdemeanor offense. *Buza,* 129 Cal.Rptr.3d at 756. The State charged Buza, on information, with arson, vandalism, and refusal to provide a DNA sample under the California DNA Collection Act. *Id.* Buza moved for an acquittal on the charge of failure to provide a DNA sample, contending that being charged with a felony was not a sufficient basis for the state to require a DNA sample. *Id.* His motion was denied, yet he continued to refuse to provide a DNA sample. *Id.* Buza was convicted on all charges. *Id.* The court ordered law enforcement to use "reasonable force" to extract the DNA sample. *Id.* Buza was sentenced to 16 months, including six months for his refusal to provide DNA. *Id.* He was informed his DNA would be uploaded into the database. *Id.*

Buza appealed his conviction for failure to provide a DNA sample, arguing that, as an arrestee, he was entitled to the presumption of innocence and had the right, under the Fourth Amendment, to be free of unreasonable searches and seizures. *Buza,* 129 Cal.Rptr.3d at 755. In analyzing Buza's facial

---

19. The California DNA Collection Act, as to its treatment of arrestees, is similar substantially to Maryland's DNA Collection Act. The same 13 loci are analyzed and uploaded to the state DNA database, which is connected to CODIS. No identifying information is included with the DNA profile. There are statutory protections against unauthorized use or disclosure of the database information. The statutes' differ, however, in that California does not require waiting until a scheduled arraignment for analysis of the sample and arrestees must request expungement, rather than the automatic procedures in the Maryland DNA Collection Act.

attack on the constitutionality of the statute authorizing DNA collection from arrestees, the court summarized relevant cases upholding DNA collection of convicted offenders, highlighting the narrow grounds on which these cases were decided or the divided views expressed by the deciding courts. *Buza,* 129 Cal.Rptr.3d at 762 (noting the "limited nature" of the holding in *United States v. Kincade,* 379 F.3d 813, 836 (9th Cir.2004), applying only to "lawfully adjudicated criminals whose proven conduct substantially heightens the government's interest in monitoring them," and the Ninth Circuit in *United States v. Kriesel,* 508 F.3d 941, 948–49 (9th Cir.2007), because its holding did not apply to arrestees).

The *Buza* court looked also to opinions that evaluated DNA collection from arrestees or pre-trial detainees. 129 Cal. Rptr.3d at 763. In *Friedman v. Boucher,* 580 F.3d 847, 851 (9th Cir.2009), a Montana law enforcement officer requested a DNA sample (under a Montana statute authorizing collection from convicted felons) from a pre-trial detainee who had been convicted, sentenced, and served time to completion in Nevada previously for an unrelated crime.[20] The *Friedman* court concluded that, despite the state's assertions that pretrial detainees have a limited expectation of privacy and that the government has a legitimate interest in collecting DNA samples for its database, forcible extraction of DNA, without a warrant and in the absence of individualized suspicion, or for the purposes of solving unsolved crimes, was unconstitutional as applied to Boucher. 580 F.3d at 851, 856. The court noted that government interests that would offset the expectation of privacy in certain circumstances (prison security or supervision and integration of parolees) are not present with pre-trial detainees and, additionally, Montana's constitution provides greater privacy protections than the Fourth Amendment. *Friedman,* 580 F.3d at 858 (citing government interests in *Samson,* 547 U.S. at 856, 126 S.Ct. at 2202, 165 L.Ed.2d at

**20.** Friedman was convicted and served his sentence in Nevada and was not under parole or probationary supervision by Montana. *Friedman v. Boucher,* 580 F.3d 847, 854 (9th Cir.2009).

262). In response to the government's argument that the search was reasonable because of the reduced privacy rights of pre-trial detainees, the court responded by noting that the Supreme Court has not allowed suspicionless searches of pre-trial detainees for reasons other than prison security. *Friedman*, 580 F.3d at 856–57. Quoting from *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908, 919 (1966), the court emphasized "[t]he importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Friedman*, 580 F.3d at 857. The *Friedman* court distinguished the holdings in *Kincade* and *Kriesel*, discussed *supra*, because those cases addressed convicted criminals and Friedman was only a pre-trial detainee for the purposes of the Montana statute. *Id.*

In *United States v. Pool*, 621 F.3d 1213 (9th Cir.2010), a divided panel of the Ninth Circuit affirmed the holding of a federal magistrate judge who found constitutional, against an as-applied challenge, provisions of the Bail Reform Act of 1966 (18 U.S.C. § 3142(b), (c)(1)(A) (2009)), and the DNA Fingerprint Act of 2005 (42 U.S.C. § 14135a (2009)) requiring Pool, as an arrestee, to provide a DNA sample as a condition of his pre-trial release.[21, 22] The majority opinion in *Pool*, adopting the magistrate judge's approach, applied the totality of the

---

**21.** The Ninth Circuit granted a rehearing en banc and directed that the three judge panel opinion, *United States v. Pool*, 621 F.3d 1213 (9th Cir.2010), not be used as precedent by any court. *United States v. Pool*, 646 F.3d 659 (9th Cir.2011). While the en banc rehearing was pending, Pool pleaded guilty, and the Ninth Circuit vacated the three judge panel opinion and dismissed the appeal as moot. *United States v. Pool*, 659 F.3d 761 (9th Cir.2011).

**22.** The Bail Reform Act of 1966 allows a judge to order that an individual who has been charged, but is released on his or her recognizance or an unsecured appearance bond while awaiting trial, "cooperate in the collection of a DNA sample" if he or she is arrested or facing federal charges. 18 U.S.C. § 3142(b) (2009). The DNA Fingerprint Act of 2005 provided the authority to collect DNA samples from persons "who are arrested, facing charges, or convicted from non-United States persons who are detained under the authority of the United States." 42 U.S.C. § 14135a(a)(1)(A) (2009).

circumstances test and concluded that a "judicial or grand jury finding of probable cause" is a "watershed event" that tips the scales in favor of "the government's interest in definitively determining the defendant's identity," at the expense of a "defendant's privacy interest in giving a DNA sample as a condition of pre-trial release...." 621 F.3d at 1219, 1226. The magistrate likened the DNA sample requirement to other conditions of pre-trial release that limit liberty, including electronic monitoring and mandatory curfews. *Pool,* 621 F.3d at 1217. The appeals-court-panel majority concluded that Pool had not shown any greater privacy interest in his DNA than had Kinkade (a convict), *supra,* because the DNA statute required that only identifying numbers be used in the reporting system. *Pool,* 621 F.3d at 1222. The competing government interests included allowing "the government to ensure that the defendant did not commit some other crime[;] ... discourage[d] a defendant from violating any condition of his or her pretrial release"; and served the same purpose of identifying potentially dangerous individuals to the public, whether arrestees or convicts. *Pool,* 621 F.3d at 1223.

In dissent, Judge Schroder countered that *United States v. Brown,* 563 F.3d 410, 414–15 (9th Cir.2009), required that the government bear the burden of showing that searches and seizures are reasonable under a Fourth Amendment exception. *Pool,* 621 F.3d at 1237. Under its application of the balancing test, the dissent concluded that Pool's expectation of privacy had not been reduced by a conviction and, therefore, the government's asserted interest in *Pool* was obliged, in order to overcome Pool's expectation, to be even more significant than those recognized with regard to convicts; the government may not rely on a "generalized interest in preventing the commission of crimes by pretrial defendants." *Pool,* 621 F.3d at 1237, 1238. The dissent remarked also on the difference between the DNA profile and the DNA sample; although the former contains numeric identifiers only, the latter contains the entire genetic makeup of an individual. *Id.*

In *United States v. Mitchell,* 652 F.3d 387 (3rd Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 1741, 182 L.Ed.2d 558

(2012), a divided Third Circuit, sitting en banc, reached a similar conclusion as did the majority in *Pool, supra.*[23] Mitchell was indicted for one count of attempted possession with intent to distribute cocaine. *Mitchell,* 652 F.3d at 398. While in pre-trial detention, he refused to give a DNA sample demanded pursuant to the federal DNA Collection Act (42 U.S.C. § 14135a(a)(1)(A) (2011)). *Id.* His refusal was upheld by the federal district court. *Mitchell,* 652 F.3d at 398. On appeal, the Third Circuit reversed. *Mitchell,* 652 F.3d at 402. Mitchell argued that collection of DNA samples from arrestees and pre-trial detainees under the DNA Collection Act constituted an unreasonable search and seizure, violating the Fourth Amendment. *Id.* The parties disagreed whether Mitchell had mounted a facial or as-applied constitutional challenge in the trial court, so the appellate court, following the guidance in *United States v. Marcavage,* 609 F.3d 264, 273 (3rd Cir.2010), considered both types of challenge. *Mitchell,* 652 F.3d at 405.[24] The court, following the direction in *Connection Distributing Co. v. Holder,* 557 F.3d 321, 327–28 (6th Cir.2009), that "[t]he usual judicial practice is to address an as-applied challenge before a facial challenge," considered first the constitutionality of the statute as applied to the facts in Mitchell's case. *Mitchell,* 652 F.3d at 405 (internal quotation omitted) (internal citation omitted).

Using the *Knights* totality of the circumstances test, the *Mitchell* court majority concluded that there are two separate searches when DNA is collected. *Mitchell,* 652 F.3d at 406. The first is the physical collection, usually via a buccal swab or a blood draw. *Id.* The court concluded that the physical

---

**23.** Mitchell filed a petition for writ of certiorari on 22 November 2011 (application number 11A384) in the United States Supreme Court. The petition was denied on 19 March 2012.

**24.** In *United States v. Marcavage,* 609 F.3d 264, 273 (3rd Cir.2010), there was ambiguity as to whether Marcavage advanced an as-applied or facial constitutional attack. The court concluded that Marcavage's "hybrid" approach to advancing both attacks was permissible and proceeded to analyze the facial challenge first because the burden was "significantly heavier" and could be decided (against him) quickly. *Id.*

intrusion was quick and painless (relatively so) and, therefore, a minimal invasion, and did not weigh in the defendant's favor. *Mitchell,* 652 F.3d at 407 (citing *Skinner,* 489 U.S. at 625, 109 S.Ct. at 1417, 103 L.Ed.2d at 665; *Nicholas v. Goord,* 430 F.3d 652, 656 n. 5 (2d Cir.2005)). The second search is the processing of the DNA sample and creation of the DNA profile. *Mitchell,* 652 F.3d at 407. Mitchell's challenge pointed to the vast amount of personal data contained within a DNA sample and the potential for misuse of the data. *Id.* The court, however, was not persuaded by Mitchell's argument, relying on the numerous statutory protections of the data and the "junk" nature of the 13 loci used to create the profile. *Mitchell,* 652 F.3d at 408. The court embraced an analogy between fingerprints and DNA profiles, treating both as routine booking procedures, and concluded that pre-trial detainees have a diminished privacy interest relative to means to ascertain and confirm their identities. *Mitchell,* 652 F.3d at 411 ("[I]t is 'elementary' that blanket fingerprinting of individuals who have been lawfully arrested or charged with a crime does not run afoul of the Fourth Amendment.") (quoting *Smith v. United States,* 324 F.2d 879, 882 (D.C.Cir.1963)).

The court in *Mitchell* conceded that the government's interests in obtaining DNA from an arrestee are not as strong as with convicts, probationers, or parolees. 652 F.3d at 413. Mitchell maintained that the interest in law enforcement is "equally well served by collecting DNA samples post-conviction," however, the court was persuaded by the government's argument that there is a strong interest in identifying arrestees. *Id.* Quoting from *United States v. Sczubelek,* 402 F.3d 175, 185 (3rd Cir.2005), the *Mitchell* court reiterated that a criminal may take "unusual steps to conceal not only his conduct, but also his identity" by using disguises, changing names, or changing physical features. 652 F.3d at 414. Such attempts by criminals to obfuscate their identities amplify the government's need to use DNA to identify accurately pre-trial detainees or arrestees, concluded the court. *Id.* The majority, however, made no mention of evidence that Mitchell had attempted to conceal his identity or that the government had

any difficulties determining Mitchell's identity without resorting to a DNA profile.

The *Mitchell* majority, quoting from *Haskell v. Brown*, 677 F.Supp.2d 1187, 1199 (N.D.Cal.2009), perceived two components to identity: "who that person is (the person's name, date of birth, etc.) and what that person has done (whether the individual has a criminal record, whether he is the same person who committed an as-yet unsolved crime across town, etc.)." *Id.* The court placed great weight on the second component, noting that a person's criminal record has important ramifications for pre-trial release considerations. *Id.* The court conceded, however, that "in comparison to the probationer cases, the interests in supervision and prevention of recidivism are much diminished, if not absent, in the context of arrestees and pretrial detainees." *Mitchell*, 652 F.3d at 415 n. 25 (quoting *United States v. Scott*, 450 F.3d 863, 874 (9th Cir.2006) ("That an individual is charged with a crime cannot, as a constitutional matter give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody.")). Concluding that the government's interest in identifying arrestees was sufficient to render the DNA Act constitutional, as applied to Mitchell, the court resolved that Mitchell's facial challenge to the statute failed. *Mitchell*, 652 F.3d at 415–16.

A strongly worded dissent criticized the *Mitchell* majority's conclusions, asserting that it gave "short shrift" to an arrestee's privacy interest by reducing it only to an interest in identity. 652 F.3d at 416 (Rendell, J., dissenting). Judge Rendell maintained that statutory limitations on the use of DNA profiles, "though not wholly irrelevant, are not panaceas, . . . and cannot offset the severe invasion of privacy that takes place when an arrestee's DNA is seized and searched." *Id.* The dissent described the privacy interest of arrestees, "while diminished in certain, very circumscribed situations, are not so weak as to permit the Government to intrude into their bodies and extract the highly sensitive information coded in their genes." *Mitchell*, 652 F.3d at 421 (Rendell, J., dissenting). Objecting to the majority's characterization of the government

interest as simply "identification," Judge Rendell countered that the purpose of collecting arrestee and pre-trial detainee DNA

> is not to "identify" the arrestee in the sense of allowing law enforcement to confirm that the correct person has been arrested or keeping records of who has been in federal custody, but to *use* those profiles and the information they provide as evidence in the prosecution and to solve additional past and future crimes.

*Mitchell,* 652 F.3d at 422–23 (Rendell, J., dissenting). Quoting the dissenting opinion in *Kincade,* Judge Rendell argued that "[t]he collection of a DNA sample . . . does not 'identify' an [arrestee or pre-trial detainee] any more than a search of his home does—it merely collects more and more information about that [arrestee or pre-trial detainee] that can be used to investigate unsolved past or future crimes." *Mitchell,* 652 F.3d at 423 (Rendell, J., dissenting) (quoting *Kincade,* 379 F.3d at 857 n. 16 (Reinhardt, J., dissenting)). Relying on the presence of the expungement provision in the statute, the dissent bolstered its argument against a simplistic "identification" purpose being the sole government interest, stating that

> [i]f the Government's real interest were in maintaining records of arrestees' identifies, there would be no need to expunge those records upon an acquittal or failure to file charges against the arrestee. Indeed, this statutory provision serves as an admission that the fact of *conviction,* not of mere arrest, justifies a finding that an individual has a diminished expectation of privacy in his DNA.

*Mitchell,* 652 F.3d at 423 (Rendell, J., dissenting). Attacking further the purported "identification only" usage of the DNA sample offered-up by the government, Judge Rendell likened the process to "the Government seiz[ing] personal medical information about you but . . . only us[ing] the subset of that information that serves to identify you." *Mitchell,* 652 F.3d at 424 (Rendell, J., dissenting).

The dissent dissected also the analogy between fingerprints and DNA, quoting from *Sczubelek,* 402 F.3d at 197–98, which

opined that collecting DNA "requires production of evidence below the body surface which is not subject to public view," as opposed to fingerprints which are accessible readily on the surface of the skin. *Mitchell,* 652 F.3d at 424–25 (Rendell, J., dissenting) (internal citation omitted). Judge Rendell rejected the reasoning of the majority in *Pool,* that probable cause for a particular crime is a "watershed event," observing that *Pool* "never explains why a finding of probable cause in connection with a particular crime justifies the collection of DNA profiles for use in connection with *other* crimes for which, by definition, there has been no finding of probable cause or, indeed, any suspicion at all." *Mitchell,* 652 F.3d at 427 (Rendell, J., dissenting). Finally, the dissent attacked the foundation of the majority's Fourth Amendment analysis by noting that there are clearly defined exceptions to the general prohibition on warrantless searches, including reasonable suspicion of imminent danger and prison and jail searches. *Mitchell,* 652 F.3d at 428 (Rendell, J., dissenting) (citing *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968); *Florence v. Burlington Cnty.,* 621 F.3d 296, 307 (3rd Cir.2010); *see generally Kincade,* 379 F.3d at 822–24). Concluding that none of those exceptions were applicable and that the majority opinion should not have accepted nonspecific, broad government goals of fighting crime to justify a Fourth Amendment violation under an analysis that seemed more like a First Amendment "rational basis" review, the dissent advocated the more stringent approach required for Fourth Amendment analyses. *Mitchell,* 652 F.3d at 428 (Rendell, J., dissenting).

The final major case considered by the *Buza* court was *Haskell,* 677 F.Supp.2d at 1187, which denied a preliminary injunction to enjoin collection of a DNA sample pursuant to the California DNA Collection Act. *Buza,* 129 Cal.Rptr.3d at 753. Plaintiffs in *Haskell* mounted a facial challenge to the California Act under the Fourth Amendment. 677 F.Supp.2d at 1192. The *Haskell* court, tracking the reasoning generally of *Kincade* and *Kriesel,* concluded that, although arrestees have a greater privacy interest than prisoners, that interest is less than that of a member of the general population; there-

fore, arrestees are subject to a broad range of restrictions. *Haskell*, 677 F.Supp.2d at 1196. The court adopted the fingerprint/DNA analogy accepted by other courts and concluded that an arrestee's privacy interest "is not weighty." *Haskell*, 677 F.Supp.2d at 1198. Following the reasoning of *Mitchell*, the *Haskell* court concluded that identification has two components and that the government has a legitimate interest in not only the name and date of birth of an arrestee, but also his or her criminal history (even criminal acts as yet undiscovered). *Haskell*, 677 F.Supp.2d at 1199. The court was concerned that "[a]n individual might wear gloves at some point, thwarting fingerprint identification, or wear a mask, thwarting the use of photographs," and, therefore, DNA sampling was a more accurate and necessary form of identification. *Id.*

In its sifting of the relevant cases, the *Buza* court rejected the DNA/fingerprint analogy relied upon in *Mitchell*, *Pool*, and *Haskell*. *Buza*, 129 Cal.Rptr.3d at 768. Similar to the dissent in *Mitchell*, *Buza* focused on whether the *use* of the DNA profile could overcome the "full extent of the *search* that has taken place." *Buza*, 129 Cal.Rptr.3d at 768 (citing *Mitchell*, 652 F.3d at 416 (Rendell, J., dissenting)). The search referred to was the extraction of the entire human genome, which is necessary to develop the DNA profile uploaded to CODIS. *Buza*, 129 Cal.Rptr.3d at 769. The court, although acknowledging that the so-called "junk DNA" is not thought currently to code for genetic information, predicted advances in scientific technology which, along with the perpetual preservation of the DNA sample (not just the DNA profile), creates privacy concerns. *Id.* Noting that requiring fingerprinting after arrest has never undergone Fourth Amendment scrutiny, the *Buza* court rejected the notion that simply because fingerprinting is commonplace that DNA should take its place readily as a routine booking procedure, without additional scrutiny.[25] *Id.*

---

**25.** The court noted with some concern the relatively facile interpretive evolution of the DNA Act occurring between *Kincade* (certain convicted

As to the governmental interest in "identification" touted by the *Haskell* court, the court in *Buza* countered that the purpose of DNA sampling was investigation actually. 129 Cal.Rptr.3d at 770–71. Fingerprints taken for identification "verify that the person who is fingerprinted is really who he says he is," while those taken for investigatory purposes are taken "to connect [the person fingerprinted] to a crime with which he was not already connected." *Buza*, 129 Cal.Rptr.3d at 770 (quoting *United States v. Garcia–Beltran*, 389 F.3d 864, 864 (9th Cir.2004)). Fingerprints obtained for identification are admissible in court, while those obtained for investigatory purposes must be suppressed if their purpose was to "connect [the arrestee] to alleged criminal activity." *Id.* (quoting *Garcia–Beltran*, 389 F.3d at 865; citing *Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985); *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969)). Addressing the far-reaching, two-component definition of "identification" advanced in *Haskell*, the *Buza* court reasoned that the very nature of the second component (the criminal history of, or as-yet-unsolved crimes committed by, that person) implies an "investigatory" purpose. 129 Cal. Rptr.3d at 753. The realities of the DNA processing system mean that identification does not happen immediately (noting an average processing time of 31 days) and the DNA database does not contain identification information. *Buza*, 129 Cal. Rptr.3d at 772–73. Collection and processing of DNA samples in California requires that fingerprints be used alongside the DNA sample to "identify the subject" specifically, lending further support to the conclusion that the purpose of the collection is not identification. *Buza*, 129 Cal.Rptr.3d at 773 (quoting *FAQs: Collection Mechanics*, question 1.1, http://ag. ca.gov/bfs/content/faqphp#mechanics (last visited 4 Aug. 2011)). The identity-obscuring initiatives of concern in *Haskell* and the comment in *Kincade* that there is no way to avoid

---

felony offenders), *Kriesel* (all convicted felony offenders), *Pool* (individuals charged with felony offenses), and then *Haskell* (arrestees who have not had a judicial determination of probable cause). *People v. Buza,* 129 Cal.Rptr.3d 753, 770 (Cal.Ct.App.2011).

leaving DNA at the scene of the crime were deemed by the *Buza* court as weighing heavily in favor of concluding that DNA sampling is actually for investigatory purposes, as these relate directly to crime scene investigation. *Buza*, 129 Cal. Rptr.3d at 773–74 (noting that an "arrestee cannot mask his or her identity by wearing gloves while being fingerprinted" or by wearing a mask while being photographed during routine booking procedures). The court concluded, from the text of the California DNA Collection Act, that the purpose of the Act was "unquestionably consonant" with the second component of identification, which is an investigatory process essentially. *Buza*, 129 Cal.Rptr.3d at 774. The California Act "involves a programmatic warrantless search of all arrestees' DNA, without individualized suspicions and prior to any judicial determination of probable cause, much less guilt." *Buza*, 129 Cal. Rptr.3d at 780. Because the purpose is "to determine whether the arrestee can be connected to a past unsolved crime and to create a databank through which he or she may now or in the future be connected to a new offense," the California DNA Collection Act did not meet any of the special needs exceptions and a generalized interest in crime fighting did not outweigh the privacy interests of mere arrestees. *Id.*

The Court of Appeals of Minnesota weighed-in on the topic, in a certified question context, finding facially unconstitutional a Minnesota statute that required charged defendants to provide a DNA sample, after a judicial finding of probable cause, but prior to a conviction. *In re Welfare of C.T.L.*, 722 N.W.2d 484, 486 (Minn.Ct.App.2006). In *C.T.L.*, a juvenile was charged with fifth-degree assault and aiding and abetting a first-degree aggravated robbery. *Id.* The State of Minnesota ordered the juvenile to provide a biological specimen for DNA analysis pursuant to Minn.Stat. § 299C105 (Supp.2005).[26] *Id.* The juvenile moved for an order certifying the question of

---

**26.** The Minnesota DNA statute provides for destruction of the DNA sample if the person is found not guilty or the charges against a person are later dismissed. *In re Welfare of C.T.L.*, 722 N.W.2d 484, 488 (Minn.Ct. App.2006).

the statute's facial constitutionality.[27] *Id.* The court began its analysis with the premise that outside of "a few specifically established and well-delineated exceptions," searches conducted "outside the judicial process, without prior approval by a judge or magistrate[,] are *per se* unreasonable." *C.T.L.*, 722 N.W.2d at 488 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454–45, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971)). Drawing on the holding of *Schmerber*,[28] the Minnesota court concluded that "establishing probable cause to arrest a person is not, by itself, sufficient to permit a biological specimen to be taken from the person without first obtaining a search warrant." *C.T.L.*, 722 N.W.2d at 490 (noting the holding in *Schmerber*, 384 U.S. at 769–70, 86 S.Ct. at 1835, 16 L.Ed.2d at 919, that "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained").

The State in *C.T.L.* advanced a *Pool* "watershed event" argument as regards the initial finding of probable cause, to which the Minnesota court responded that the "argument fails to recognize ... that probable cause to support a criminal charge is not the same thing as probable cause to issue a search warrant." 722 N.W.2d at 490. The court explained that "probable cause [for charging purposes] ... exists when

27. The certified question was

> Do the portions of Minn.Stat. § 299C.105, subd. 1(a)(1) and (3) (Supp.2005), that direct law-enforcement personnel to take a biological specimen from a person who has been charged with an offense, but not convicted, violate the Fourth Amendment to the United States Constitution and Article I, Section 10, of the Minnesota Constitution?

> *C.T.L.*, 722 N.W.2d at 486–87.

28. *Schmerber* involved a defendant who was arrested for drunk driving based on the probable cause of the smell of alcohol and his blood-shot, watery, and glassy eyes. *Schmerber v. California*, 384 U.S. 757, 769, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908, 919 (1966). The Supreme Court upheld the drawing of blood from Schmerber on the narrow special circumstances that waiting for a search warrant would have allowed the alcohol in his system to disappear, thus, an exigent circumstance was pivotal to the Court's reasoning. *Schmerber*, 384 U.S. at 770, 86 S.Ct. at 1835, 16 L,Ed.2d at 919. Outside of this "emergency" situation, a warrant to invade the body should be obtained "by a neutral and detached magistrate." *Id.*

the evidence worthy of consideration brings the charge against the prisoner within reasonable probability." *Id.* (internal citations omitted). On the other hand, probable cause to support a search warrant is found when there is "a fair probability that contraband evidence of a crime will be found in a particular place." *Id.* (internal citation omitted). Conflation of the two standards of probable cause, the *C.T.L.* court concluded, dispenses with the Fourth Amendment requirement that, in order to conduct a search, "law-enforcement personnel must obtain a warrant based on a neutral and detached magistrate's determination that there is a fair probability that the search will produce contraband or evidence of a crime." 722 N.W.2d at 491. Relying on the expungement provision in the Minnesota statute (which allowed those found not guilty ultimately or had charges dropped to have their DNA samples destroyed), the court reasoned that those persons found not guilty had an expectation of privacy greater than the State's need for DNA and, therefore, this interest should be applied reasonably to all persons charged, but not convicted yet. *C.T.L.*, 722 N.W.2d at 491–92. Finally, the *C.T.L.* court concluded that the privacy interest of a person who is charged, but not convicted, is not outweighed by the state's interest in collecting DNA samples. 722 N.W.2d at 492.

In *United States v. Purdy*, No. 8:05CR204, 2005 WL 3465721, *1, 2005 U.S. Dist. LEXIS 40433, *1 (D.Neb.2005), a federal district court, against the recommendation of its magistrate judge, granted a defendant's motion to suppress DNA evidence collected under the Nebraska Identifying Personal Characteristics Act ("Nebraska Act"), which allowed law enforcement, without a court order, to collect DNA samples from arrestees.[29] Purdy was arrested on an outstanding warrant

---

**29.** The Nebraska Act allowed collection of "physical evidence from individuals to aid them in identifying the perpetrators of criminal offenses," including "fingerprints, palm prints, footprints, measurements, handwriting exemplars, lineups, hand printing, voice samples, blood samples, urine samples, saliva samples, hair samples, comparative personal appearance, and photographs." *United States v. Purdy,*

and, at arrest, found to possess a firearm. *Purdy*, 2005 WL
3465721, at *1, 2005 U.S. Dist. LEXIS 40433, at *3. After his
arrest, correctional officers collected forcefully DNA samples,
causing physical injuries to Purdy that required medical treat-
ment. *Id.* Conceding that the Fourth Amendment does not
protect a "characteristic that a person knowingly exposes to
the public," like fingerprints or visual likeness, the court
distinguished DNA as not exposed to the public and able to
reveal medical facts for which individuals have a reasonable
expectation of privacy. *Purdy*, 2005 WL 3465721, at *3–4,
2005 U.S. Dist. LEXIS 40433, at *11. Beginning with the
*Katz* premise that a search without a warrant is per se
unreasonable, the court concluded that none of the "special
needs" exceptions were applicable and used the totality of the
circumstances balancing test to evaluate Purdy's challenge.
*Purdy*, 2005 WL 3465721, at *4–5, 2005 U.S. Dist. LEXIS
40433, at *13–15. The Nebraska Act did not provide a consti-
tutional basis for the search of Purdy because the statute
would allow warrantless DNA sampling of anyone arrested,
"without the showing of any nexus between the alleged crime
and the information that a DNA test would reveal." *Purdy*,
2005 WL 3465721, at *6–7, 2005 U.S. Dist. LEXIS 40433, at
*21–22. Comparing the expectation of privacy and the gov-
ernment interest in convicts, parolees, and probationers to
that of arrestees, the court resolved that an arrestee's expec-
tation of privacy outweighs the government desire for war-
rantless searches. *Purdy*, 2005 WL 3465721, at *6–7, 2005
U.S. Dist. LEXIS 40433, at *20–21. Because probable cause
for arrest is not the same as required for a search, "[a] person
arrested, but not convicted, for a certain crime cannot be
forced to provide DNA "identification" evidence without a
showing that such evidence would identify him as the perpe-
trator of the crime." *Purdy*, 2005 WL 3465721, at *7, 2005
U.S. Dist. LEXIS 40433, at *22. The court noted also that its
holding did not prevent all arrestees from being subjected to

---

No. 8:05CR204, 2005 WL 3465721, *1, 2005 U.S. Dist. LEXIS 40433,
*3–4 (D.Neb.2005).

DNA sampling; rather, law enforcement officers would need to obtain a search warrant from a "neutral and detached judicial officer." *Purdy,* 2005 WL 3465721, at \*7, 2005 U.S. Dist. LEXIS 40433, at \*23.

A fractured, three-judge panel of the Arizona intermediate appellate court upheld an Arizona statute allowing a judge to condition pre-trial release upon collection of a DNA sample. *Mario W. v. Kaipio,* 228 Ariz. 207, 265 P.3d 389 (Ariz.Ct.App. 2011). Five juveniles were charged [30] and an "advisory" court concluded there was probable cause for bringing the charges. *Mario W.,* 265 P.3d at 392. Pre-trial release was conditioned on the giving of DNA samples. *Mario W.,* 265 P.3d at 395. The juveniles contended that the Arizona statute violated the United States and Arizona constitutional protections against unreasonable searches and seizures and their rights to privacy. *Id.* Using the totality of the circumstances test, the Court of Appeals of Arizona, Division One, weighed the following factors in balancing the juveniles' privacy rights against the government interest:

> whether there was a judicial finding of probable cause that the juvenile committed the charged offense, the level of intrusion in relation to the other pre-adjudicative procedures, the degree and nature of physical intrusion required by the test, statutes restricting the use of test results, and any evidence in the record regarding improper uses of the results.

*Mario W.,* 265 P.3d at 396. Agreeing with the conclusion in *Pool,* that a finding of probable cause is a "watershed event," the court determined that the five juveniles were distinguishable from the general public in such a way that permitted an exception to the Fourth Amendment's prohibition against warrantless searches. *Id.* Other statutory restrictions placed on

---

**30.** Two additional juveniles were arrested, but there was no judicial finding of probable cause as to them. *Mario W. v. Kaipio,* 228 Ariz. 207, 265 P.3d 389, 392 (Ariz.Ct.App.2011). Therefore, the court concluded the pre-trial condition of DNA collection was unconstitutional as applied to the facts of their cases. *Id.*

pre-trial detainees, including GPS tracking, supported the court's conclusion that the juveniles had a reduced expectation of privacy. *Mario W.,* 265 P.3d at 397 (citing Ariz. R.P. Juv. Ct. 23(E)). The government interest served was an "enhanced interest in crime prevention and deterrence," based on the post-arrest finding of probable cause. *Mario W.,* 265 P.3d at 397. The court noted also that the level of physical intrusion of a buccal swab was minimal. *Id.* The government had a strong interest in determining accurately the juvenile's past criminal history in order to set the proper pre-trial release conditions. *Id.* Moreover, taking an arrestee's DNA sample aids the government in solving crimes and expands the DNA database. *Mario W.,* 265 P.3d at 398. The court relied also upon the purpose of identification, agreeing with *Mitchell* that arrestees do not have a legitimate expectation of privacy in their identity. *Mario W.,* 265 P.3d at 399. A concurring judge wrote separately to advance the fingerprint-to-DNA analogy as the basis for upholding the statute. *Mario W.,* 265 P.3d at 401 (Orozco, J., concurring).

The third judge, in a dissenting opinion, rejected the analogy of DNA-to-fingerprints and, focusing on the arrestees' presumption of innocence, concluded that the State failed to meet its burden to provide justification for abrogating the juveniles' expectation of privacy. *Mario W.,* 265 P.3d at 404 (Norris, J., dissenting). The dissent criticized the majority for misapplying the totality of the circumstances test when it concluded that the juveniles had "little if any expectation of privacy in their DNA because they have been arrested and a court has found probable cause to hold them for trial." *Mario W.,* 265 P.3d at 405 (Norris, J., dissenting). Rather, argued the dissent, under Supreme Court jurisprudence, the *conviction* is what alters meaningfully the expectation of privacy, not the mere charging. *Mario W.,* 265 P.3d at 405 (Norris, J., dissenting) (citing *Knights,* 534 U.S. at 118, 122 S.Ct. at 591, 151 L.Ed.2d at 504) (emphasis added). Criticizing also the majority's likening of DNA sampling to other pre-trial release conditions, Judge Norris maintained, as the better reasoned approach, that DNA sampling under prevailing collection tech-

niques is distinguishable because it is a physical intrusion into the body and the juveniles' privacy was further invaded when the DNA sample is analyzed and the profile extracted. *Mario W.*, 265 P.3d at 406 (Norris, J., dissenting).

Rejecting the fingerprint/DNA analogy, Judge Norris noted that a "fingerprint is an impression left by the depositing of oil upon contact between a surface and the fission ridges of the fingers," while DNA "stores massive amounts of personal, private data about an individual." *Mario W.*, 265 P.3d at 407 (Norris, J., dissenting) (quoting *Mitchell*, 365 F.3d at 221; *Kincade*, 379 F.3d at 842 n. 3 (Gould, J. concurring)) (internal quotations omitted). The dissent took pains also to protest subsuming DNA sampling into "routine booking practices," countering that fingerprinting became routine prior to the evolution of modern "reasonable expectation of privacy" jurisprudence and "[t]hat today we accept fingerprinting as a routine practice without Fourth Amendment implications does not mean we must accept DNA sampling as being the same." *Mario W.*, 265 P.3d at 407–08 (Norris, J., dissenting).

Finally, Judge Norris criticized the majority's characterization of the statute's purpose as identification only, pointing out that, if that were the case, expungement upon the dismissal of charges would not be necessary. *Mario W.*, 265 P.3d at 408 (Norris, J., dissenting). Noting that the State failed to produce any evidence that there was any difficulty in obtaining accurate identification of any of the juveniles, which might require another method of identification, the dissent argued that "DNA itself provides no identifying information; a DNA sample is only useful when it can be compared to a prior DNA sample obtained from the same person . . . [i]f the arrestee's DNA is not in a DNA database, there can be no comparison and thus no verification of identity." *Id.* The dissent closed with its concern that the majority opinion will "contribute to the downward ratchet of privacy expectations," and that "[a] highly expansive opinion [authorizing a warrantless search], one that draws no hard lines and revels in the boon that new technology will provide to law enforcement, is an engraved invitation to future expansion." *Mario W.*, 265 P.3d at 409

(Norris, J., dissenting) (quoting *Scott,* 450 F.3d at 867; *Kincade,* 379 F.3d at 873 (Kozinski, C.J., dissenting)).

We conclude our survey of relevant opinions with *Anderson v. Commonwealth,* 274 Va. 469, 650 S.E.2d 702, 703 (2007). The Supreme Court of Virginia upheld, against an as-applied Fourth Amendment challenge, a Virginia statute that authorized DNA collection from individuals upon arrest. *Anderson,* 650 S.E.2d at 703. In 2003, Anderson was arrested for rape and sodomy and his DNA sample was collected pursuant to Va.Code Ann. § 19.2–310.2:1 (2007). *Anderson,* 650 S.E.2d at 704. Anderson's DNA profile was uploaded to the DNA databank, resulting in a match to a forensic sample collected from an unsolved 1991 rape. *Id.* Based on the database "hit," detectives obtained a search warrant for an additional DNA buccal swab, the analysis of which provided the primary evidence at Anderson's trial for the 1991 rape as well as the 2003 crimes. *Id.* His motion to suppress the DNA evidence was denied. *Id.* He was convicted of rape, robbery, and sodomy, and sentenced to two life terms, plus ten years. *Id.*

The Virginia Supreme Court concluded that, although a DNA sample is more revealing, it "is no different in character than acquiring fingerprints upon arrest." *Anderson,* 650 S.E.2d at 705. Adopting the fingerprint-to-DNA analogy advanced in *Nicholas, Sczubelek,* and this Court's decision in *Raines,* the Virginia court concluded that DNA collection is acceptable as part of the routine booking process as a way of obtaining an arrestee's identification. *Anderson,* 650 S.E.2d at 705–06. In doing so, the court rejected Anderson's reliance on *City of Indianapolis v. Edmond,* 531 U.S. 32, 47, 121 S.Ct. 447, 457, 148 L.Ed.2d 333, 347 (2000), standing for the proposition that general crime control purposes can "only be justified by some quantum of individualized suspicion," and *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), stating that general law enforcement searches are not exempt from the requirements of probable cause. *Anderson,* 650 S.E.2d at 706. The Virginia court relied upon the reasoning in *Jones v. Murray,* 962 F.2d 302, 306 (4th Cir.1992), which considered only application of the Virginia

DNA collection statute to convicted felons, but extended the rationale to routine booking procedures, and as such, "no additional finding of individualized suspicion, much less probable cause, must be established before the sample may be obtained." *Anderson,* 650 S.E.2d at 706.

## D. The Present Case

■ We consider first whether King's constitutional challenge to the Maryland DNA Collection Act is as-applied, facially, or both. It is generally preferable for a court to analyze whether a statute is constitutional under the more narrow as-applied standard first, as a matter of judicial efficiency rather than analyzing the broader facial challenge first. *Bd. of Trs. v. Fox,* 492 U.S. 469, 485, 109 S.Ct. 3028, 3037, 106 L.Ed.2d 388, 407 (1989) (noting that "for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first").[31] It is clear in the present case that King mounts both facial and as-applied Fourth Amendment challenges.

■ Under Maryland common law, there is a strong presumption that statutes are constitutional. *Koshko v. Haining,* 398 Md. 404, 426, 921 A.2d 171, 183 (2007) (citing, among other cases, *Ayres v. Townsend,* 324 Md. 666, 675, 598 A.2d 470, 475 (1991)). To succeed in an as-applied constitutional challenge, King must show that "under [these] particular circumstances [he was] deprived ... of a constitutional right." *Mitchell,* 652 F.3d at 406 (quoting *Marcavage,* 609 F.3d at 273).

■ To evaluate King's as-applied challenge, we analyze the totality of the circumstances, using the *Knights* balancing test that weighs King's expectation of privacy on one hand and the state's interests on the other, keeping in mind that the "touch-

---

**31.** Analyzing the as-applied challenge first is, apparently, not a hard and fast rule. *See Marcavage, supra,* which analyzed the facial challenge first because of the "significantly heavier" burden required for facial challenges and anticipating a speedy resolution of this prong of the constitutional challenge. 609 F.3d at 273.

stone" of Fourth Amendment analysis is reasonableness. Our analysis is influenced also by the precept that the government must overcome a presumption that warrantless, suspicionless searches are per se unreasonable. As other courts have concluded, we look at any DNA collection effort as two discrete and separate searches. The first search is the actual swab of the inside of King's mouth and the second is the analysis of the DNA sample thus obtained, a step required to produce the DNA profile. Although some courts follow *Mitchell* in assessing the buccal swab technique as a quick and painless intrusion, we shall not ignore altogether the gravity of a warrantless search and collection of biological material from a mere arrestee. The State bears the burden of overcoming the arrestee's presumption of innocence and his expectation to be free from biological searches before he is convicted of a qualifying crime. As we held in *Raines,* once a person has been adjudicated lawfully to be a felon, his or her expectation of privacy is "severely reduced" and the State's interest prevails in monitoring, identifying, reintegrating, and preventing recidivism by the felon. Here, however, the expectation of privacy of an arrestee renders the government's purported interests in DNA collection reduced greatly. If application of the balancing test results in a close call when considering convicted felons, as our deeply divided decision in *Raines* suggests, then the balance must tip surely in favor of our closely-held belief in the presumption of innocence here. King's expectation of privacy is greater than that of a convicted felon, parolee, or probationer, and the State's interests are more attenuated reciprocally.

### i. King's Expectation of Privacy

█ King must have a personal, subjective expectation of privacy in order for Fourth Amendment protections to apply. *See Katz,* 389 U.S. at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588. As Judge Wilner's concurring opinion in *Raines* noted, DNA samples contain a "massive amount of deeply personal information." 383 Md. at 50, 857 A.2d at 48. The State advances the syllogism that "all that was obtained through [the] search

[of King] was his identity—in the form of 13 pairs of numbers"; there is no right to anonymity; and, thus, the evidence presented at trial is not suppressible. This argument ignores plainly the implications of the search that took place.

That the Maryland DNA Collection Act restricts the *use* of the biological material obtained does not change the nature of the search. As Judge Rendell noted in her dissenting opinion in *Mitchell,* upholding the statute simply because of restrictions on use of the material obtained would be analogous to allowing the government to seize private medical records without a warrant, but restrict their use only to the portion of the records that serve to identify the patient. This analogy addresses the State's stance of denying the importance or relevance of the initial physical intrusion and the later processing of King's genetic materials. King, as an arrestee, had an expectation of privacy to be free from warrantless searches of his biological material and all of the information contained within that material.

We do not embrace wholly the analogy between fingerprints and DNA samples advanced in Judge Raker's concurring opinion in *Raines* and by the State in the present case. As aptly noted, fingerprints are a physical set of ridges on the skin of a person's fingers that, when exposed to ink (or other medium) and the resultant imprint placed on paper or electronic records, can determine usually and accurately a person's identity by matching the physical characteristics to a known set of fingerprints. DNA, on the other hand, is contained within our cells and is collected by swabbing the interior of a cheek (or blood draw or otherwise obtained biological material). While the physical intrusion of a buccal swab is deemed minimal, it remains distinct from a fingerprint. We must consider that "[t]he importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great." *Schmerber,* 384 U.S. at 770, 86 S.Ct. at 1835, 16 L.Ed.2d at 919.

The information derived from a fingerprint is related only to physical characteristics and can be used to identify a person,

but no more. A DNA sample, obtained through a buccal swab, contains within it unarguably much more than a person's identity. Although the Maryland DNA Collection Act restricts the DNA profile to identifying information only, we can not turn a blind eye to the vast genetic treasure map that remains in the DNA sample retained by the State. As Judge Wilner noted in his concurring opinion in *Raines,*

> A person's entire genetic makeup and history is forcibly seized and maintained in a government file, subject only to the law's direction that it not be improperly used and the prospect of a misdemeanor conviction if a custodian *willfully* discloses it in an unauthorized manner. No sanction is provided for if the information is non-willfully disclosed in an unauthorized manner, though the harm is essentially the same.

383 Md. at 50, 857 A.2d at 49. In *Raines,* the State's interest regarding DNA collection from convicted felons overwhelmed these considerations. We do not revisit or question that result. Convicted felons are not at issue here. The greater expectation of privacy of an arrestee and the lesser legitimate interest of the State bring concerns about the privacy of genetic material to a different dynamic in the application of the balancing test. Courts that have upheld DNA collection from arrestees have done so by relying on the fingerprint-to-DNA analogy and a belief that DNA collection has become just another routine booking procedure. While it may be elementary that arrestees undergo photographic and fingerprinting collection, neither of these techniques has undergone definitive Fourth Amendment scrutiny. Even were the fingerprint-to-DNA analogy less tenuous, as described *supra,* we should not be so quick to heap additional exceptions onto a constitutional principle, without a clearer, judicially-proven foundation.

The State underestimates, in seeking to apply conclusively our holding in *Raines* to the present case, the power of a conviction. Raines's conviction was critical to our analysis there, that convicted felons have a "severely reduced expectation of privacy"; the difference regarding a mere arrestee is

critical here. Although arrestees do not have all the expectations of privacy enjoyed by the general public, the presumption of innocence bestows on them greater protections than convicted felons, parolees, or probationers. A judicial determination of criminality, conducted properly, changes drastically an individual's reasonable expectation of privacy. The expungement provisions of the Act recognize the importance of a conviction in altering the scope and reasonableness of the expectation of privacy. If an individual is not convicted of a qualifying crime or if the original charges are dropped, the DNA sample and DNA profile are destroyed. The General Assembly recognized the full scope of the information collected by DNA sampling and the rights of persons not convicted of qualifying crimes to keep this information private. This right should not be abrogated by the mere charging with a criminal offense: the arrestee's presumption of innocence remains.

The percentage of individuals charged with felonies that are convicted eventually is persuasive. According to data collected by the FBI in 2004, between 16 and 71 percent of individuals charged with a felony are convicted eventually (including guilty pleas), depending on the crime.[32] Bureau of Justice Statistics, U.S. Dept. of Justice, *Sourcebook of Criminal Justice Statistics*, tbl. 5.0002.2004 (Kathleen Maguire ed.), available at http://www.albany.edu/sourcebook/pdf/t500022004.pdf (last visited 20 Apr. 2012). The reasons for this disparity between arrests and convictions are not always apparent, but they illustrate the potential amount of DNA samples that would be collected and processed without a finding of guilt.

■ We agree with the Minnesota Court of Appeals in *C.T.L.* that "establishing probable cause to arrest a person is

---

**32.** The rates of conviction per 100 arrests for various crimes were: 16 for motor vehicle thefts, 25 for aggravated assault, 44 for burglary, 46 for robbery, 56 for rape, 68 for murder, and 71 for drug trafficking. Bureau of Justice Statistics, U.S. Dept. of Justice, *Sourcebook of Criminal Justice Statistics*, tbl. 5.0002.2004 (Kathleen Maguire ed.), available at http://www.albany.edu/sourcebook/pdf/t500022004.pdf (last visited 20 Apr. 2012).

not, by itself, sufficient to permit a biological specimen to be taken from the person without first obtaining a search warrant." 722 N.W.2d at 490. A finding of probable cause for arrest on a crime of violence under the Maryland DNA Collection Act cannot serve as the probable cause for a DNA search of an arrestee.

## ii. Government Interest

■ This Court accepted the State's argument in *Raines* that the purpose of the Maryland DNA Collection Act is to identify individuals, rather than to collect evidence.[33] While that may be true in the context of maintaining a record of inmates, felons, parolees, or probationers (as was the case regarding the scope of the Act at the time *Raines* was decided), in the present case, identification is not what King's DNA sample was used for or needed, and, in most circumstances, will likely not be the case with other arrestees. Solving·cold cases, in the State's view, is an ancillary benefit of determining the proper identification of an individual, but for King it was the only State interest served by the collection of his DNA. The State here can not claim the same public safety interests present in cases addressing convicted felons, parolees, or probationers. There is no interest in prison safety or administration present. Although we have recognized (and no one can reasonably deny) that solving cold cases is a legitimate government interest, a warrantless, suspicionless search can not be upheld by a "generalized interest" in solving crimes.

Courts upholding statutes authorizing DNA collection from arrestees rely on an expansive definition of "identification" to sweep-up "cold case" crime-solving as a government purpose recognized and approved previously by courts in other contexts. This expanded definition of identity encompasses the

---

33. We note in the present case, as we did in *Raines,* that the express purposes of the statute are to analyze genetic material to assist in an official investigation of a crime, to identify human remains, to identify missing individuals, or for research and administrative purposes. Md. Code (2003, 2011 Repl.Vol.), Pub. Safety Art., § 2–505.

traditional name, date of birth, address, and physical charac-
teristics, but also "what that person has done," including
his/her past known criminal record and as-yet-unsolved
crimes. *See Haskell,* 677 F.Supp.2d at 1199. Although the
State does not advance directly this argument here, it is
implicated by the State's heavy reliance on forms of "identifi-
cation" (or evidence, as the case may be) that may have been
collected from previous crimes and compared to the "identifi-
cation" of an arrestee. Such an argument stretches the
bounds of reasonableness under our view of proper Fourth
Amendment analysis. We decline to accept it in light of its
impacts on an arrestee's expectations of privacy in his or her
genetic material, unless that material is deemed properly
abandoned.

The State argues that it has a legitimate purpose in identi-
fying accurately arrestees. Accepting this argument *arguen-
do,* the State presented no evidence that it had any problems
whatsoever identifying accurately King through traditional
booking routines. King had been arrested previously, given
earlier fingerprint samples, and been photographed. There is
no claim that King presented false identification when arrest-
ed or had altered his fingerprints or appearance in any way
that might increase the State's legitimate interest in requiring
an additional form of identification to be certain who it had
arrested. The FBI's fingerprint database is a reliable method
for law enforcement to identify (or confirm the identities of)
arrestees promptly and accurately. When an arrestee's fin-
gerprints are uploaded to the database, the results (which
include a photograph, fingerprints, and a criminal history) are
returned within minutes. This system contains not only crimi-
nal records, but also fingerprints uploaded voluntarily by
citizens. This database is essential to law enforcement during
routine booking of arrestees. On the other hand, the FBI's
DNA database contains no personal identifying information,
no names, no birth dates, no social security numbers, and no
criminal histories. A "hit" may take months to return. The
DNA sample is not analyzed until after the first scheduled
arraignment date. The profile must be uploaded and the
database searched. The laboratory must return the DNA

profile. When a "hit" arises, a law enforcement officer is notified, who must request the additional information.

King was arrested on 10 April 2009. The "hit" was returned on 4 August 2009. At this point, King had been identified accurately via other methods. There is no evidence that the DNA "hit" bolstered or clarified his already confirmed identity.

The State's purported interests are made less reasonable by the fact that DNA collection can wait until a person has been convicted, thus avoiding all of the threats to privacy discussed in this opinion. DNA profiles do not change over time (as far as science "knows" at present), so there is no reasonable argument that unsolved past or future crimes will go unresolved necessarily. We simply will not allow warrantless, suspicionless searches of biological materials without a showing that accurate identification was not possible using "traditional" methods.

In cases where DNA is required for conviction, there will be likely substantial other evidence to provide probable cause for a search warrant. Unfortunately, that does not seem likely in the present case. As regards King's 2009 assault charge that gave rise to collection of his initial compelled DNA sample, the State proceeded to *nolle prosequi* all of the qualifying crimes. King was convicted only of second-degree assault, which is not a qualifying crime under § 2–504.[34]

 As regards to King's facial challenge to the Act, a party challenging facially the constitutionality of a statute "must establish that no set of circumstances exist under which the Act would be valid." *Koshko,* 398 Md. at 426, 921 A.2d at 184 (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697, 707 (1987)). In *Salerno,* the Supreme Court set out, in dictum, the "no set of circum-

---

34. Because of the combination of the State's choice to nol pros these charges and the compulsion, on remand of the present case, that King's motion to suppress be granted, King can be tried on the qualifying charges and it is unlikely that a new DNA sample may be obtained under the Act.

stances" test that is used broadly to decide facial constitutional challenges; however, the over-arching distinction between facial and as-applied challenges, in the wake of *Salerno,* has been less than clear. *See, e.g.,* Alex Kreit, *Making Sense of Facial and As–Applied Challenges,* 18 Wm. & Mary Bill Rts. J. 657, 658 (2010). The Supreme Court, post-*Salerno,* has not applied consistently the "no set of circumstances" test to facial challenges. *See City of Chicago v. Morales,* 527 U.S. 41, 55, n. 22, 119 S.Ct. 1849, 1858, n. 22, 144 L.Ed.2d 67, 79, n. 22 (1999) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court . . ."); *Chandler v. Miller,* 520 U.S. 305, 318, 117 S.Ct. 1295, 1303, 137 L.Ed.2d 513, 526 (1997) (sustaining a facial attack on a Georgia statute requiring drug tests for political candidates, without mentioning the *Salerno* standard); *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 202, 128 S.Ct. 1610, 1623, 170 L.Ed.2d 574, 590–91 (2008) (concluding that "a facial challenge must fail where the statute has a plainly legitimate sweep") (quoting *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449, 128 S.Ct. 1184, 1190, 170 L.Ed.2d 151, 160 (2008) (internal quotations omitted)). Despite the unclear application of *Salerno* among the federal courts, we apply the test here according to *Koshko.* We conclude that King's facial challenge to the statute fails because there are conceivable, albeit somewhat unlikely, scenarios where an arrestee may have altered his or her fingerprints or facial features (making difficult or doubtful identification through comparison to earlier fingerprints or photographs on record) and the State may secure the use of DNA samples, without a warrant under the Act, as a means to identify an arrestee, but not for investigatory purposes, in any event.[35]

The State posits that because King's DNA swab obtained only evidence of his identity the evidence is not suppressible.

---

**35.** The possible scenarios where law enforcement may require DNA samples to identify an arrestee bring to mind the 1997 film *Face/Off* where a hypothetical face transplant was used to change identities.

This argument runs counter to the Supreme Court's holdings in *Hayes,* 470 U.S. at 817, 105 S.Ct. at 1647, 84 L.Ed.2d at 711, and *Davis,* 394 U.S. at 727, 89 S.Ct. at 1398, 22 L.Ed.2d at 681, which concluded that fingerprints obtained illegally were suppressible under the Fourth Amendment. King's identity was not the evidence that served as probable cause for his grand jury rape indictment. A driver's license, fingerprint, photograph, or social security card, all accepted generally as forms of identification, could not have stood in the place of King's DNA sample before the grand jury. What was presented to the grand jury was a match between biological evidence collected from King's 2009 buccal swab and the evidence collected during a sexual assault forensic exam from the 2003 rape victim. This biological match is not analogous to a person's name or address, which the Court of Special Appeals held not to be suppressible in *Gibson v. State,* 138 Md.App. 399, 414, 771 A.2d 536, 545 (2001). Assuming *arguendo* that fingerprints and DNA present an apt analogy, they are both suppressible evidence when obtained illegally.

As we conclude that the Maryland DNA Collection Act, as applied to King as an arrestee, was unconstitutional, and King's 10 April 2009 DNA sample was obtained illegally, we must conclude that the second DNA sample, obtained on 18 November 2009, pursuant to a court order based on probable cause gained solely from the "hit" from the first compelled DNA sample, is suppressible also as a "fruit of the poisonous tree." The "fruit of the poisonous tree" doctrine excludes evidence obtained in violation of the Fourth Amendment. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 456 (1963); *Myers v. State,* 395 Md. 261, 291, 909 A.2d 1048, 1066 (2006). Under the "fruit of the poisonous tree" doctrine, the defendant bears the burden of showing 1) primary illegality and 2) "the cause and effect relationship between the primary illegality and the evidence in issue, to wit, that the evidence was, indeed, the identifiable fruit of that particular tree." *Cox v. State,* 421 Md. 630, 651–52, 28 A.3d 687, 699 (2011) (citing *Gibson,* 138 Md.App. at 404, 771 A.2d at 539). Here, we have determined that the original

DNA collection was illegal. The cause-and-effect relationship between King's original buccal swab and the court-ordered second buccal swab is not attenuated in any way. The first buccal swab provided the sole probable cause for King's first-degree rape grand jury indictment. There was no other evidence linking King to the 2003 unsolved rape. Were it not for the buccal swab obtained illegally after King's assault arrest, there would be no second DNA sample which could have been used as evidence in King's trial for the charges enumerated in footnote seven, *supra*. The DNA evidence presented at trial was a fruit of the poisonous tree.

**JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE STATE.**

BARBERA and WILNER, JJ., dissent.

BARBERA, J., dissenting, in which WILNER, J., joins.

I dissent. The Court decides today that the police violated King's Fourth Amendment right to be free from unreasonable searches, when the police, after arresting King based on probable cause that he had committed a violent crime, took a DNA sample via a buccal swab, pursuant to the Maryland DNA Collection Act, Maryland Code (2003, 2011 Repl.Vol.), § 2–504(a)(3) of the Public Safety Article (Act). The majority arrives at this decision by overinflating an arrestee's interest in privacy and underestimating the State's interest in collecting arrestee DNA, and in doing so, plays fast and loose with the well-recognized test for determining the constitutionality of warrantless searches.

It is not disputed—indeed there is no doubt—that the buccal swab was a "search," for purposes of the Fourth Amendment.[1] *See Skinner v. Ry. Labor Executives Ass'n,*

---

1. It also is undisputed that law enforcement officials in the present case followed every one of the statutory and regulatory mandates of the Act when testing King's DNA sample and making use of its results.

489 U.S. 602, 616, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The question, then, is whether this warrantless search complied with the strictures of the Fourth Amendment, the touchstone for which is "reasonableness." *United States v. Knights*, 534 U.S. 112, 118, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); *accord Wilson v. State*, 409 Md. 415, 427, 975 A.2d 877, 884 (2009). The test for ascertaining the answer to the reasonableness inquiry is one adopted by the Supreme Court long ago, *Terry v. Ohio*, 392 U.S. 1, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and followed by this Court ever since, *see Anderson v. State*, 282 Md. 701, 704–05, 387 A.2d 281, 283 (1978); *Wilson*, 409 Md. at 427, 975 A.2d at 884.

Under that test, whether a given warrantless search is reasonable requires balancing the privacy interests of the individual searched against the legitimate government interests promoted by the search. *Samson v. California*, 547 U.S. 843, 848, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006); *accord Wilson*, 409 Md. at 427, 975 A.2d at 884. The test has been employed to uphold searches of persons in situations akin to the case at bar. *See, e.g., Samson*, 547 U.S. at 847, 126 S.Ct. 2193 (holding that a police officer's warrantless, suspicionless search of a parolee was reasonable under the Fourth Amendment); *State v. Raines*, 383 Md. 1, 41, 857 A.2d 19, 43 (2004) (holding that the warrantless collection of DNA from "a certain group of convicted persons" was reasonable because "the minimal physical intrusion on the inmate, a person with a diminished expectation of privacy, is outweighed by the legitimate governmental interest in identifying persons involved with crimes, including vindicating those falsely convicted"); *see also Knights*, 534 U.S. at 122, 122 S.Ct. 587 (holding that balancing of the competing interests at stake rendered reasonable the warrantless search, supported by reasonable suspicion, of a probationer's home).

The majority recognizes that the balancing test is the appropriate test to determine the reasonableness, and hence the constitutionality, of the search at issue here. 425 Md. 550, 562–63, 42 A.3d 549, 556–57. Regrettably, both for the present case and all other future cases like it, the majority's

application of the test to the circumstances here could not be more wrong. Proper analysis of the competing privacy and governmental interests at stake exposes the error.

To repeat, "reasonableness" depends on a balance between the governmental interests and the individual's right to personal security free from arbitrary interference by law officers. In assessing, first, the interests at stake for King, I bear in mind that consideration of the privacy interest implicated by the buccal swab involves identifying both the nature of the privacy interest enjoyed by King at the time of the swab and the character of the intrusion itself. *See Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.").

The majority misstates the degree to which King's privacy was impinged by his arrest. The majority juxtaposes King's status as an arrestee with that of a convicted felon, probationer, or parolee, and then declares that King's privacy interest is "greater" than that of persons in those categories because he enjoys a presumption of innocence. 425 Md. at 593–95, 42 A.3d at 575–76. Certainly, up to the moment of conviction, King enjoyed the presumption of innocence in connection with the crimes charged. Yet King's status as a presumed-innocent man has little to do with the reduced expectation of privacy attendant to his arrest, processing, and pre-trial incarceration (even if for but a short time). For purposes of the Fourth Amendment analysis, King's privacy expectation at the time of the cheek swab was far more like a convicted felon, probationer, and parolee than an uncharged individual. To make the point, I need mention only some of the intrusions on personal privacy that attend any arrest.

The lawful intrusions that could be, and likely were, visited upon King began at or soon after the moment of arrest. Any arrestee is lawfully subject to an immediate, head-to-toe

search of his person and any personal belongings in his possession at the time. *See United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). At the station-house, the arrestee can be subjected as a matter of protocol (and without the need for individualized suspicion) to a warrantless strip-search, even if the arrest is for a minor offense. *Florence v. Cnty. of Burlington,* 566 U.S. ——, 132 S.Ct. 1510, 1521, 182 L.Ed.2d 566 (2012) (Filed April 2, 2012). *See also Bell,* 441 U.S. at 558, 99 S.Ct. 1861 (approving body cavity searches of pretrial detainees). Even if not strip-searched, the arrestee can be subject to observation, while in various stages of undress, by police officials; and the arrestee, if placed in a cell with or near other arrestees, can be subject to similar observation by them (or police officials) while using the toilet. *See Johnson v. Phelan,* 69 F.3d 144, 145, 150 (7th Cir.1995). In short, any arrestee, including King, has a grossly diminished privacy expectation.

The majority's Fourth Amendment analysis also suffers from its mislabeling the character of the intrusion upon privacy and bodily integrity occasioned by the cheek swab, and the degree to which the arrestee's privacy interest is impinged as a result of the information obtained thereby. DNA collection in Maryland is achieved by rubbing and rotating a cotton swab on the inside of an individual's cheeks. This procedure involves placing a cotton instrument inside the mouth for a few seconds, and contacting the cheek with enough pressure to remove a biological sample. The buccal swab technique has been described as "perhaps the least intrusive of all seizures," Jules Epstein, *"Genetic Surveillance"—The Bogeyman Response to Familial DNA Investigations,* 2009 U. Ill. J.L. Tech & Pol'y 141, 152 (2009) (hereafter "Epstein"), and a "relatively noninvasive means of obtaining DNA" that "pose[s] lowered risk for both the subject and laboratory personnel," Amy H. Walker, et al., *Collection of Genomic DNA by Buccal Swabs for Polymerase Chain Reaction–Based Biomarker Assays,* 107 Envtl. Health Perspective 517, 520 (1999).

A buccal swab is less physically invasive than the drawing of blood, which the Supreme Court addressed in *Schmerber v.*

*California,* 384 U.S. 757, 771–72, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The Court held in that case that the warrantless drawing of a blood sample from an arrestee, at the direction of a police officer, did not violate the Fourth Amendment prohibition against unreasonable searches. The Court described the drawing of blood as "commonplace" and "involv[ing] virtually no risk, trauma, or pain." *Id.* at 771, 86 S.Ct. 1826. Since then, the Supreme Court has characterized the intrusiveness of blood-drawing as "not ... an unduly extensive imposition on an individual's personal privacy and bodily integrity," *Winston v. Lee,* 470 U.S. 753, 762, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); and "not significant," *Skinner,* 489 U.S. at 625, 109 S.Ct. 1402. If the subcutaneous removal of blood from a person's veins presents only a marginal intrusion into that person's privacy interest, *a fortiori* the insertion of a cotton swab into a person's mouth is less of an intrusion and fairly characterized as *de minimis.* Unlike the process of drawing blood, performing a buccal swab does not require skin to be pierced, or a hard, foreign object to be situated inside of the body.

In short, I agree with the reasoning of the United States Court of Appeals for the Ninth Circuit in *Haskell v. Harris,* 669 F.3d 1049, 1059 (9th Cir.2012). The court in *Haskell* upheld a DNA collection statute that permits buccal swabs of all adults arrested for felonies explaining that,

> the physical extraction of DNA using a buccal swab collection technique is little more than a minor inconvenience to felony arrestees, who have diminished expectations of privacy. Moreover, it is substantially less intrusive, both physically and emotionally, than many of the other types of approved intrusions that are routinely visited upon arrestees.

*accord United States v. Mitchell,* 652 F.3d 387, 407 (3rd Cir.2011) (noting, in a case upholding the constitutionality of a federal statute that authorizes DNA collection from arrestees, that "the intrusion occasioned by the act of collecting the DNA sample is minimal and does not weigh significantly in [the arrestee's] favor").

The amount and character of the information obtained from analysis of the cheek cells is also pertinent to the privacy interest analysis. Here too, the majority's analysis misses the mark. The Act authorizes the collection of biological material that contains an individual's entire genome. The majority seizes on this point, reasoning that "[a] DNA sample . . . contains within unarguably much more than a person's identity[,]" 425 Md. at 596, 42 A.3d at 577, and in that way is unlike a fingerprint, which only "can determine . . . a person's identity by matching the physical characteristics [of the fingerprint] to a known set of fingerprints," *id.* For this reason, notwithstanding that § 2–505(b) of the Act only authorizes DNA analysis for the purpose of identification, the majority is unable to "turn a blind eye to the vast genetic treasure map that remains in the DNA sample retained by the State." 425 Md. at 596, 42 A.3d at 577.

I could not disagree more. I interpret the majority's concerns as much like those expressed by the plaintiffs in *Haskell, supra,* which the court described as "evok[ing] images of an oppressive 'Big Brother' cataloging our most intimate traits." 669 F.3d at 1059. I, like the Ninth Circuit, believe that "the reality is far less troubling." *See id.* The Act categorically prohibits the plundering of "the vast genetic treasure map" that is incidentally made available by DNA collection. Up to five years of imprisonment and/or a fine of up to $5,000, *see* § 2–512(e) of the Act, awaits anyone who "willfully test[s] a DNA sample for information that does not relate to the identification of individuals as specified in this subtitle," § 2–512(c) of the Act. The same potential punishments await anyone who discloses information from a DNA profile, or discloses genetic information from the collected DNA sample itself. *See* § 2–512(a) of the Act. In short, the Act forecloses, without exception, all avenues by which a genetic pirate can obtain and exploit the "genetic treasure map" contained within a collected DNA sample.

Even more important to the privacy assessment is that the procedure by which DNA samples are tested cannot disclose intimate genetic information. COMAR 29.05.01.09(A) effec-

tively restricts the testing of DNA to the 13 loci specified by the FBI and CODIS. These specific loci are non-coding; "in other words, the genetic material at these locations is not known to determine a human attribute such as height, weight, or susceptibility to a particular disease." Epstein, *supra* at 143. We have recognized the non-coding nature of these 13 loci, sometimes referred to as "junk" loci, in *Williamson v. State*, 413 Md. 521, 542–43, 993 A.2d 626, 639 (2010). These 13 loci exist in a "hypervariable region" of the DNA strand. "Outside of the hypervariable regions, the genomes of two randomly chosen individuals exhibit few differences. In contrast, within the hypervariable regions, two randomly chosen individuals will exhibit a number of differences." Julian Adams, *Nuclear and Mitochondrial DNA in the Courtroom*, 13 J.L. & Pol'y 69, 74 (2005). Therefore, the loci cannot reveal any genetic information about an arrestee, other than that the arrestee is identifiably different from other members of the human race. And in showing that an arrestee's DNA is identifiably different from others' DNA, the loci can potentially show that an arrestee's DNA is identical to strands of DNA collected from an unknown source, i.e. a crime scene. *See Raines*, 383 Md. at 25, 857 A.2d at 33 ("the only information obtained from the DNA linked to the individual pursuant to the Act is the DNA identity of the person being tested.").

Though surely a far more sophisticated and "new" means of identification than fingerprints, DNA analysis, when used solely for purposes of identification is, in the end, no different. Both are limited markers that can reveal only identification information. As Judge Raker aptly pointed out in her concurring opinion in *Raines:*

> DNA type need be no more informative than an ordinary fingerprint.... The "profile" of an individual's DNA molecule that is stored in a properly constructed DNA identification database (like the FBI's Combined DNA Index System (CODIS)) is a series of numbers. The numbers have no meaning except as a representation of molecular sequences at DNA loci that are not indicative of an individual's personal traits or propensities. In this sense, the CODIS 13–STR

"profile" is very much like a social security number—though it is longer and is assigned by chance, not by the federal government.

*Id.* at 45, 857 A.2d at 45–46 (Raker, J., concurring) (quoting D. Kaye and M. Smith, *DNA Identification Databases, Legality, Legitimacy, and the Case for Population–Wide Coverage,* 2003 Wis. L.Rev. 413, 431–32 (2003)). In this way, the numbers of a DNA profile are identical to the ridges of a fingerprint—the information derived from both is, as the majority concedes, "related only to physical characteristics and can be used to identify a person, but no more." 425 Md. at 595–96, 42 A.3d at 576–77.

The Supreme Court has given, albeit impliedly, the constitutional "go ahead" for the fingerprinting procedure. *See Hayes v. Florida,* 470 U.S. 811, 817, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985) ("There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch."). Given the similarity of fingerprinting and the DNA collection authorized by the Act, there is little concern that the Act implicates a weighty privacy interest.

Furthermore, if an arrestee has any interest in the information extracted from collected DNA, it is a privacy interest in the identification information revealed by the 13 loci. Given the already-diminished expectation an arrestee has in privacy generally, an arrestee can have only a modicum of interest in identity privacy, if any interest at all. *Cf. Raines,* 383 Md. at 25, 857 A.2d at 33 ("As such, appellee and other incarcerated individuals have little, if any, expectation of privacy in their identity.").

On the other side of the Fourth Amendment reasonableness balancing equation is the State's interest in the use and retention of DNA evidence. I need not discuss here the

significance of all the government interests at stake, although there are at least three: identifying arrestees, solving past crimes, and exonerating innocent individuals. *See Haskell*, 669 F.3d at 1062–65 (discussing those interests); *Mitchell*, 652 F.3d at 413–15 (same).

We emphasized in *Raines* that identifying perpetrators of crimes is a "compelling governmental interest." 383 Md. at 21, 857 A.2d at 31. In responding to this strong law enforcement interest, the majority eludes faithful application of the case law on the subject of "identity," by carefully circumscribing its meaning. The majority reasons that "identity" includes only an individual's name, age, address, and physical characteristics, but does not include "what [the] person has done." 425 Md. at 598–99, 42 A.3d at 578. Based on this reasoning, the majority notes that the government can claim no legitimate interest in identifying an individual for the purpose of uncovering past misdeeds. *Id.* From that premise the majority holds that the Act is unconstitutional as applied to King because King's DNA collection was superfluous: the identification interest already was served by the fingerprinting and photographing of King. 425 Md. at 599–601, 42 A.3d at 579–80.

On the majority's first point, nothing in the law supports the majority's restrictive definition of identity. In the context of the Fourth Amendment, the Supreme Court has made clear that law enforcement's interest in identity extends to knowing whether a person has been involved in crime. *See Hiibel v. Sixth Judicial Dist. Ct.*, 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) ("Obtaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder."). The majority's definition raises the rhetorical question: "Why law enforcement would want to know a person's name, if not to know whether that person is linked to crime?"

On the second point, the majority essentially holds that DNA collection cannot displace traditional methods of identification because those traditional methods are less intrusive and in use effectively. 425 Md. at 600–01, 42 A.3d at 579–80. The Court of Appeals for the Ninth Circuit in *Haskell* characterized such reasoning as "a Luddite approach" to Fourth Amendment interpretation. 669 F.3d at 1063. "Nothing in the Constitution compels us to ... prevent the Government from using this new and highly effective tool [of identification] to replace (or supplement) older ones." *Id.* Moreover, the Supreme Court has been clear in "repeatedly refus[ing] to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment." *City of Ontario v. Quon,* —— U.S. ——, ——, 130 S.Ct. 2619, 2632, 177 L.Ed.2d 216 (2010) (quoting *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 663, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995)). Finally, as this Court recognized in *Raines,* "[i]t is not for us to weigh the advantages of one method of identification over another." 383 Md. at 20, 857 A.2d at 30 (quoting *Jones v. Murray,* 962 F.2d 302, 308 (4th Cir.1992)).

Even assuming that the government's strong interest in identifying perpetrators of crime is the only interest at stake in this case (which it is not), that interest, when balanced against the significantly diminished expectation of privacy attendant to taking a buccal swab of an arrestee, yields, in my view, an obvious answer to the question presented in this case. The swab of King's inner cheek to extract material from which 13 DNA "junk" loci are tested to identify him is a reasonable search, and therefore permitted by the Fourth Amendment. I therefore would affirm the judgment of the Circuit Court for Wicomico County.

Judge WILNER authorizes me to state that he joins the views expressed here.